**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Southern Division**

| | |
|---|---|
| **VINCENT HEARN**<br>4854 E. Charleston Ave<br>Scottsdale, Arizona 85254<br><br>Plaintiff,<br><br>v.<br><br>**EDGY BEES INC.**<br>9841 Washingtonian Blvd., Suite 220<br>Gaithersburg, Maryland 20878<br><br>SERVE:    CSC-Lawyers Incorporating Service Co.<br>        Resident Agent<br>        7 St. Paul St., Suite 820<br>        Baltimore, Maryland 21202<br><br>and<br><br>**ADAM KAPLAN**<br>9841 Washingtonian Blvd., Suite 220<br>Gaithersburg, Maryland 20878<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**<u>COMPLAINT</u>**

**COMES NOW** the Plaintiff, VINCENT HEARN, and for his Complaint against

Defendants EDGY BEES INC. and ADAM KAPLAN states the following:

**<u>Parties</u>**

1.    At all relevant times, Plaintiff VINCENT HEARN ("Plaintiff" or "Mr. Hearn") was

an Arizona resident having a principal address at 4854 E. Charleston Avenue, Scottsdale,

Arizona 85254.

2.    Defendant EDGY BEES INC. ("Edgy Bees"), upon knowledge and

belief, is a Delaware corporation authorized to do business in the State of Maryland as a foreign corporation and with its principal place of business located at 9841 Washingtonian Blvd., Suite 220 in Gaithersburg, Maryland. At all relevant times, Edgy Bees was aware of, ratified and confirmed the actions of its employees, agents, subcontractors and/or representatives.

3.     Defendant ADAM KAPLAN ("Mr. Kaplan"), an individual, is, and at all times relevant herein was, a resident of Israel. Defendant Mr. Kaplan is now, and at all relevant times was, the Chief Executive Officer of Edgy Bees. Mr. Kaplan and Company are collectively referred to hereinafter as "Defendants."

## Jurisdiction

4.     The Court has subject matter jurisdiction over the federal subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1332. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332(a) because the parties are citizens of different states. Plaintiff is a resident of Arizona; Defendant Edgy Bees is a Delaware corporation with its principal places of business in Maryland and Israel, and Defendant Mr. Kaplan is a resident of Israel. Additionally, the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs. The Court has jurisdiction over the remaining state common law subject matter of this action pursuant to 28 U.S.C. § 1367(a).

5.     This Court has personal jurisdiction over Edgy Bees because, *inter alia,* Edgy Bees conducts business in Maryland.  This Court has personal jurisdiction over Mr. Kaplan because, prior to COVID and at relevant times herein, he regularly spent 5-10 business days working in Gaithersburg, Maryland, thus purposefully availing himself of the laws and benefits of Maryland. In addition, Defendants have committed multiple tortious acts within the state of Maryland, thus availing themselves to the jurisdiction of this state.

6.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims set forth herein occurred in this District.

### Factual Background Common to All Counts

7.     Mr. Hearn is a United States Air Force retiree and Purple Heart recipient. Mr. Hearn held a Top Secret SCI ("Sensitive Compartmented Information") Security Clearance during his service in the military. While stationed in Germany, Mr. Hearn received the Cavalier de Strause award, the highest award given to any non-German citizen, directly from the German government for saving the lives of two women.

8.     After spending time stationed in Germany, Japan, Korea, and the Middle East and receiving three (3) Meritorious Service Medals, Mr. Hearn returned to the United States and spent his final years in the military stationed at the Air Education Training Command Air Force Headquarters at Randolph AFB in San Antonio, Texas. He held the position of Command Special Weapons Manager for the Air Education & Training Command until his retirement from the military.

9.     Mr. Hearn is a 70% US Service-Disabled Veteran due to his combat related injuries.

10.     Anticipating military retirement but still committed to serving his country, Mr. Hearn began working in the federal contract procurement field while still in the military and he attained a Level 2 certification in Procurement & Acquisition Management from the Air Force Institute of Technology.

11.     After retiring from the Air Force, Mr. Hearn transitioned his military and contracting expertise to a civilian career within federal contracting, holding key executive level positions with Dynamics Research Corporation, and Harris Corporation.  Mr. Hearn was appointed by

Secretary of Defense William Perry to lead the federal division of a classified startup named

Xyterra Computing in Scottsdale, Arizona. After September 11, 2001 and funding on the

program was lost, Mr. Hearn transitioned to Contract Acquisitions Group and then Contract

Defense Group where he oversaw all government sales and was employed there for 8

years. Here, Mr. Hearn gained invaluable experience in selling to the US Government,

managing all aspects of contracts and understanding FAR & DFAR regulations.

12.     In 2014, Mr. Hearn moved to Wamore, Inc, a federal contracting company specializing

in precision air drop for the US Government and US foreign allies – initially as its contract

manager then its Director of Business Development and Foreign Military Sales Program.  In the

five (5) years that Mr. Hearn worked with Wamore, he became ITAR and EAR certified, won

International Contractor of the Year for the company by the state of Arizona, and brought in

$46M in US Government contracts and $62M in foreign military sales deals. He also

transitioned a research and development contract with the US Army into a Program of Record,

creating more than $17M in recurring revenue.

13.     In 2019, Mr. Hearn was offered a position at an Unmanned Aerial Vehicle ("UAV")

startup, Airobotics.  In only six (6) months, Mr. Hearn secured $117M in qualified

opportunities, both domestic and international. Thereafter, UAV lost its startup funding, laid off

its workforce and shut down its US/Arizona operations.

14.     On September 25, 2019 Mr. Hearn applied for a position with Edgy Bees as its

Business Development Director.

15.     On October 18, 2019 Mr. Kaplan invited Mr. Hearn to fly to San Diego to meet with

him for an initial interview. Mr. Kaplan was extremely interested in Mr. Hearn's contacts and

set up interviews for him with multiple Edgy Bees personnel.

16.   October 27, 2019, Mr. Kaplan discussed a compensation package with Mr. Hearn and offered him a position. On October 28, 2019, as directed by Mr. Kaplan, Mr. Hearn flew to Israel to meet with additional Edgy Bees personnel team and begin employment. Edgy Bees hired Mr. Hearn, effective November 1, 2019, as its Global Business Development Director.

17.   Mr. Kaplan verbally negotiated an employment offer with Mr. Hearn and delivered a draft Offer Letter via email on November 5, 2019 dated November 1, 2019.  **Exhibit 1**.  The Offer Letter referenced a "written compensation plan" that would be provided to Mr. Hearn. The Offer Letter stated that the terms of Mr. Hearn's employment shall be governed by the law of the State of Maryland.

18.   Mr. Hearn brought to Edgy Bees his expansive list of contacts in the Department of Defense and foreign military sales arena, the existing opportunities in the UAV industry, his years of experience selling into the US government and foreign military sales markets, as well as his contract administration and management expertise. No one at Edgy Bees had Mr. Hearn's skills and connections.

19.   Recognizing Mr. Hearn's immediate value, Mr. Kaplan began contacting Mr. Hearn prior to Mr. Hearns official start date.  Even before his official first day, Mr. Kaplan began e-mailing information to Mr. Hearn regarding an upcoming proposal for the AFWERX/US Air Force SBIR Phase II STRATFi contract via his personal e-mail.

20.   The agreement between Mr. Hearn and Edgy Bees governing non-discretionary payment of commission was set forth in Edgy Bees' Individualized Compensation Plan, which was not received by Mr. Hearn until on Sunday, January 19, 2020. **Exhibit 2.** The Individualized Compensation Plan has no eligibility requirements and provided, *inter alia*:

> Commissions will be calculated in accordance with the incentive schedules and based on the following percent, out of Recognized Revenue from a Qualified Sale based accounting which assigned by the company.

It is hereby clarified that Commissions will only be paid to Participants after the Company has received payment from the customer for the New Sales or the Renewals.

21.     The Individualized Compensation Plan provided for the following commission payments:

| Aggregate Attributable Contract Proceeds (in US $) | % of Attributable Contract Proceeds Payable to Service Provider |
| --- | --- |
| Up to $2,000,000 | 4% |
| Between $2,000,000 to $4,000,000 | 6% |
| Above $4,000,000 | 8% |

22.     Edgy Bees also provided a second, inconsistent compensation plan – the Sales Compensation Plan. **Exhibit 3**.

23.     Under Section III of the Sales Compensation Plan, both "employees" and "service providers" are defined as a "Participant," but neither term is separately defined. In this document, and in subsequent communications from Edgy Bees, Mr. Hearn is referred to as both an "employee" and a "service provider."

24.     Mr. Hearn met any/all other eligibility requirements set forth in Section III.

25.     Under the Sales Compensation Plan, "compensation" is defined as "all Commissions or other payments potentially due under the Plan." "Recognized revenue" is defined as "Compensation."

26.     Throughout his employment and continuing until his termination Mr. Hearn was subjected to different and less favorable treatment, including verbal abuse at Monday morning sales meetings. Mr. Kaplan routinely would call and text Mr. Hearn at all hours of the night and on the weekends, especially on Sunday when he knew Mr. Hearn attended church with his family. Likewise, Mr. Kaplan regularly scheduled meetings for Mr. Hearn on Sunday mornings and holidays.

27.     Unlike other management personnel, Mr. Hearn was not provided with a company credit card. Mr. Hearn was required to place significant travel expenses on his personal credit card and wait a substantial time for reimbursement. Though requested otherwise by Mr. Hearn on numerous occasions both verbally and in writing, Edgy Bees, at the direction of Mr. Kaplan, did not treat Mr. Hearn as it did other similarly situated employees, and caused him undue financial stress and harm.

28.     Throughout November, immediately after his hire, Mr. Hearn flew to numerous locations and met with numerous potential funding candidates.

29.     On or about November 27, Mr. Hearn learned that the STRATFi program required a minimum of $3M in government commitment to permit proposal submission, which was due on December 16. As of December 9, Mr. Kaplan had tried, but failed, to get funding commitments from any potential customers or contacts.

30.     Mr. Hearn worked to prepare Edgy Bees' proposal for the Stage 2 proposal for STRATFi submission to the US Air Force AFWERX ("AFWERX") program office (submitted December 16). By the end of 2019, Mr. Hearn had prepared a timeline for visiting government customers to secure funding, as well as setup milestones for the final proposal which was due February 12, 2020.

31.     On January 9, 2020, Mr. Hearn met with Russ Sinclair, US Special Operations Command (SOCOM) Project Manager regarding funding of 27th Special Operations Group (SOG) program for STRATFi.

32.     Because of Mr. Hearn's efforts, Edgy Bees was notified on January 11, 2020 that it was selected to participate in the full/final Proposal Process.  The next day, Mr. Hearn organized

and led an internal preparation meeting ahead of the discussion with the AFWERX program office.

33.     On January 13, 2020, the AFWERX program office sent Mr. Hearn additional instructions for the Phase II STRATFi proposal. On January 16, 2020, he participated in the AFWERX discussion for Edgy Bees as part of the Stage 3 of the Proposal process. Over the next three (3) weeks, Mr. Hearn oversaw proposal finalization. On February 7, 2020, Mr. Hearn participated in a second AFWERX question session.

34.     On February 28, 2020, Mr. Hearn had an additional meeting with Mr. Sinclair, who agreed to fund the contract.

35.     On March 10, 2020, Edgy Bees received a preliminary notification of award on the STRATFi contract from the AFWERX program office. However, work still needed to be done before thefinal award was delivered.

36.     On April 3, 2020, Mr. Hearn prepared and sent the kickoff draft to prepare for the contract negotiation.

37.     On April 7, 2020, Mr. Hearn was introduced to the government official, Jonathan Bearce, Contracting Officer and Procurement Analyst for the US Air Force, to start the negotiation and due diligence process in order to secure a contract start and final award. On April 9, the cost proposal submitted by Mira Maman, Edgy Bees' Chief Financial Officer, was rejected by Mr. Bearce and a complete revision was requested.

38.     From April 9 through July 1, 2020, Mr. Hearn undertook almost a daily effort to revise the Milestone Sheet, and the Cost Proposal. After seven (7) revisions of the Cost Proposal, multiple extensive Q&A emails exchanged with Mr. Bearce, explanation and documentation of

private investments, multiple milestone revisions, research and analysis of matching costs and working with the US SOCOM Program Office, the final proposal submission was accepted.

39.     On July 1, 2020, Mr. Hearn was personally notified by the Air Force contracting officer that Edgy Bees was officially awarded the STRATFi contract, valued at $12 million USD.

40.     Soon thereafter, on July 7, Mr. Kaplan sent an e-mail to the team stating "Congrats to all - especially to Vince."

41.     Later in July, after Edgy Bees secured the contract and the first Milestone payment of $800,000 was invoiced and commission payment to Mr. Hearn was due, Mr. Kaplan sent an e-mail to Mr. Hearn attempting to take credit for the award.  Only after Mr. Hearn responded with a lengthy recitation of his efforts, Mr. Kaplan admitted, "I am not taking credit for the STRATFi deal which you indeed led to close."

42.     Without Mr. Hearn's combination of sales experience and federal contract management combined, Edgy Bees would not have closed the STRATFi $12M contract and would not have secured the award. This deal was Edgy Bees' only significant revenue in 2020 and largest in the company history to date, as reiterated by company employees, Board Members, Advisors to the Board, multiple articles published in the media, and Mr. Kaplan himself.

43.     In order for the U.S. government to award the STRATFi contract, Edgy Bees was required to secure private investor matching, equal to the government funded amount. Thus, the total contract value was $12M. By August 2020, Edgy Bees had, to date, received and disclosed to the government at least $4.7M in private investor funding directly related to the contract Mr. Hearn closed.

44.     In June 2020, Mr. Kaplan directed that he and Mr. Hearn set up weekly 1x1 meetings. Mr. Kaplan canceled, for no legitimate reason, a majority of his weekly scheduled meetings with Mr. Hearn yet maintained his weekly 1x1 meetings with other employees. Whenever Mr. Hearn tried to contact Mr. Kaplan, Mr. Kaplan would claim that he was traveling or in meetings. However, he was regularly available for other employees.

45.     Mr. Hearn's belief that he was treated differently also was reinforced with Edgy Bees' actions concerning employee pay. In March 2020, many employees – including Mr. Hearn – were asked to defer wages. By July, Mr. Hearn discovered that all other employees had returned to their regular wages, yet under the direction of Mr. Kaplan he was the only one that had not. Unlike all others, Mr. Hearn had to wait until September - and only after repeated requests to Mr. Kaplan. Unlike the other employees and under the direction of Mr. Kaplan, Mr. Hearn still has not received his deferred wages which total $13,750.

46.     Moreover, this non-payment of wages is inconsistent with Mr. Kaplan's contemporaneous demand that Mr. Hearn undertake additional duties.  No other employee had a similar accretion of duty involuntarily imposed without compensation.

47.     In July 2020, Edgy Bees characterized $6M of the STRATFi contract as "recognized revenue" which, in part, bolstered its balance sheet moving forward and allowed Edgy Bees to secure a total of $9.5M in private investor funding ($6M of which was directly related to, and only to be used for, work on the STRATFi contract per the US Air Force and AFWERX guidelines and regulations of this contract). Prior to award, and as an eligibility requirement of the proposal, Edgy Bees had to prove its ability to contribute $6M in private investment funding to be allocated to this total contract award and is considered part of the contract award value according to the AFWERX program office.  This funding was certified by the Government

Contracting Officer prior to award, via notarized letters, from the private investors confirming their investment into the STRATFi contract.

48.     Under Section IV(A)(1) of the Sales Compensation Plan (**Exhibit 3**):

New Sales Commissions are paid by the Company to Participant 30 days after the quarter in which a Qualified Sale becomes a Recognized Revenue.

49.     In July 2020, Mr. Hearn was denied permission by Mr. Kaplan to work remotely while accompanying his family on vacation. Yet, the Director of Programs in Maryland, Sheffy Glassberg (Caucasian), was permitted to do so at the same time.

50.     Mr. Hearn repeatedly expressed his concerns regarding unequal treatment by Mr. Kaplan to Mr. Glassberg, who suggested that Mr. Hearn speak with Human Resources. In mid-August 2020, Mr. Hearn had a teleconference with the Human Resources Director, Moran Taichler, to discuss these issues and concerns, including his concerns about discrimination.  Ms. Taichler promised to discuss the concerns with Mr. Kaplan.

51.     In August 2020, Mr. Hearn disclosed his concerns to Trevor Matz (Executive Director of the Advisory Board) that Mr. Kaplan was prejudice and was targeting him. Mr. Matz agreed that Mr. Hearn was treated differently yet stated their conversation would never be spoken of or repeated again.

52.     Per the STRATFi contract, Edgy Bees was required to obtain a US Secret Facility Clearance and hire US Secret Cleared employees. Each time Edgy Bees certified completion of a milestone, invoiced the US government and was paid, knowingly not in compliance with the FAR and DFAR regulations of the contract, Edgy Bees was defrauding the U.S. government by claiming compliance.

53.     The contract requires that Edgy Bees have a Facility Security Clearance and

hire US secret clearance engineers in the US to work on the contract because work is performed on classified systems within the US Air Force such as the MQ9 drone program.

54. Although Mr. Hearn was hired for Business Development, based on his contract management experience, Mr. Hearn disclosed and cautioned Edgy Bees management, including Mr. Glassberg, Ms. Taichler and Mr. Kaplan, regarding violations of the FARs, DFARs and the STRATFi contract itself regarding its handling US Air Force sensitive information, (*i.e.* ("NOFORN:" no foreign eyes on sensitive information)).

55. Edgy Bees' management system was required to prevent unauthorized disclosure of classified and sensitive unclassified information, and the US government was to be immediately notified if any security incident or any indication of a potential unauthorized disclosure or compromise of classified or sensitive unclassified information.

56. On numerous occasions, Mr. Hearn disclosed to Mr. Glassberg a specific FAR regulation (FAR Clause 5352.204-9000 regarding facility clearance for working on classified programs) for which Edgy Bees was in violation and about which Mr. Glassberg was worried.

57. At the time of Mr. Hearn's termination, most of Edgy Bees' engineering, development, and invention work remained in violation as disclosed by Mr. Hearn to Mr. Glassberg, Michael Crouse (Mr. Hearn's replacement), Mr. Kaplan, Mr. Menashe Haskin (co-founder and head engineer in Israel), and Mr. Matz and still was being done by its engineering team in Israel. However, in accordance with the requirements of the contract, Edgy Bees assured the AFSOC/US SOCOM Program Managers that it hired US engineers and planned to hire eleven (11) engineers costed out to this contract, per its cost proposal sent to and approved by the US Air Force on June 23, 2020 to do the work.

58. Additionally, in the Private Funding Cost Plan sent to and approved by Mr. Bearce,

Edgy Bees represented that it would hire Field Support Engineers, Field Test Team, Product Manager, Research & Development Lead with security clearance, and security cleared software developers, in concert with hiring a US Government Cost Accountant and a Contract Administrator, all to be employed within the United States.

59.   The Work Plan and Private Funding Investment schedule which was provided to the contracting officer before the contract award (to confirm what Edgy Bees would be doing with the contract money) informed the US government that in FY2020, Edgy Bees would hire classified US engineers, and multiple other positions in the United States to work exclusively on this contract. However, Edgy Bees cut the hours of its only US-born, non-dual citizen engineer capable of obtaining a Secret Security Clearance, Mr. Jerry Heyman whowas the US Software Team Lead, and transferred most of the work to the team in Israel. Mr. Hearn disclosed to Mr. Glassberg and Ms. Taichler his concerns for minimum compliance, which he disclosed were not being met, and that Edgy Bees needed to hire a US engineering team to work on the sensitive unclassified parts of the contract. FAR Clause 252.204-7012 Safeguarding Covered Defense Information and Cyber Incident Reporting is included in the contract.

60.   In violation of the contract and FAR requirements, Edgy Bees never disclosed to the US government that information would be transferred back and forth to Israel. Upon information and belief, this disclosure was relayed to Mr. Kaplan.

61.   On July 7, 2020 Mr. Kaplan, in an effort to exclude Mr. Hearn from the process, sent an email stating that Ms. Taichler would be in charge of this process from now on. On July 8, 2020 Ms. Taichler informed Mr. Hearn that she and Mr. Haskins were taking over the FSO and Security Clearance duties.  However, these duties could not be performed by foreign citizens, and no other individual in Edgy Bees had the experience of the security clearance process.

62.   At time of Mr. Hearn's termination, and six months after contract award and receipt of

funding, no one had been hired in the US. Instead, the only US-born citizen and employee, was

the US Software Team Lead, Dr. Jerry Heyman, who was the only employee legally capable of

filling the requirements set out in the contract. His hours were reduced and he subsequentially

left the company. This directly conflicts with Edgy Bees' representations made to the US

government regarding funding.

63.    Mr. Hearn disclosed additional violations. In July 2020, Mr. Hearn stated that

Edgy Bees hire a Facility Security Officer (FSO) consulting company to assist in securing a

Facility Clearance and employee Secret Clearances for the US team.  As part of this process,

Edgy Bees also needed to appoint an internal FSO to facilitate information between the FSO

consultants and the company.  For Edgy Bees to obtain personnel security clearances, the

company has to secure a Facility Security Clearance at the same level, which creates an issue as

they were owned by a foreign parent company. The Defense Counterintelligence Security

Agency (DCSA) requires foreign owned companies to fill out a formal Foreign Ownership,

Control & Interest form, as well as a Special Security Agreement (SSA).  The DCSA requires a

number of firewalls and controls between Edgy Bees and its foreign owned parent company.

Edgy Bees is required to implement a Technology Control Plan (TCP) and Electronic Control

Plan (ECP), which imposes controls to ensure no unauthorized access by the parent to classified

or sensitive unclassified information. DCSA also prohibits any "shared services" between the

two entities, unless such shared service has been disclosed and approved by DCSA. Edgy Bees

is required to implement an Affiliated Operations Plan (AOP), describing any proposed shared

services and its plan to mitigate the risk associated with the shared service.  Edgy Bees intended

to defraud the US government, to secure its required clearance and to secure its payment by

representing it was not owned by a foreign entity and that Mr. Kaplan was the sole owner.

64.     As part of the Facility Clearance process, Edgy Bees needed to appoint 3 internal positions to be held by key management employees.  These employees, among other eligibility criteria, must be US citizens and cannot be dual citizens.  These positions are Facility Security Officer, Assistant Facility Security Officer and Insider Threat Program Security Officer.  Mr. Hearn was the only Edgy Bees employee qualified to hold these positions, and Mr. Glassberg recommended to Mr. Kaplan, Mr. Haskins and Ms. Taichler that Mr. Hearn be appointed.  In September 2020, the consulting company notified Mr. Glassberg and Mr. Hearn of some of the requirements of the internal FSO, as well as some of the documentation that wouldbe needed identified key personnel in the company.

65.     The internal FSO had to be a Key Management Employee and US born citizen, at a minimum of other qualifying items. Mr. Hearn was recommended because he was a Key Employee, the only US born citizen in the company, the only non-dual citizen, the only employee with past US Top Secret SCI Security Clearance and the only employee with any US military, DoD, contracting or government program management experience. This position becomes a watchdog on behalf of the US Government to ensure the company was complying with its security clearance requirements.

66.     In September 2020, Mr. Hearn sent an email to Mr. Glassberg identifying his serious concerns regarding the information the FSO was requesting, and what Edgy Bees would need to provide to comply. Mr. Glassberg indicated via email that he already spoke to Mr. Kaplan and Mr. Haskins regarding these concerns, as well as spoke with Mr. Matz the day before.

67.     As Edgy Bees started to assemble documentation for the clearance process, the FSO consulting company required multiple corporate documents for initiation and setup. Even though Mr. Hearn was tasked with transferring confidential corporate documents to the FSO consulting company, Mr. Kaplan intentionally excluded him and asked Mr. Glassberg and Ms.

Maman to handle the transactions.

68.    Mr. Hearn suspected that information in the documents was not correct, or that information was being excluded, thereby raising the potential to defraud the US government. Mr. Hearn disclosed that providing false information was not acceptable and would place Edgy Bees in breach of its contract.

69.    Edgy Bees response, directed by Mr. Kaplan, was to omit responsive information concerning owners, board members and investors (because some were not U.S. citizens and/or foreign owned entities) and to further exclude Mr. Hearn from executive meetings and from the documentation process that would require him to verify the security protection for the US Government.  This exchange of information and his exclusion occurred in October 2020.

70.    Per FAR regulation 52.204.17 Ownership & Control, Edgy Bees validated through its registration with the US Government as a federal contractor in the System for Award Management (SAM) that it did not have an immediate owner and are owned by a foreign entity.

71.    However, Edgy Bees did not register the foreign entity (Edgy Bees, Ltd) within the SAM system and did not provide the applicable NCAGE code.  This also directly conflicts with Edgy Bees' attempt to get its facility security clearance and information being transferred to the FSO consulting company.  In these documents, Mr. Kaplan was identified as the sole owner.

72.    Edgy Bees, Inc falsely certified to the US Government in its annual Reps & Certs filing that it "DID NOT INTEND" to do any work on any government contract in a different place of performance than the address listed on their SAM registration.  This is a violation of FAR Clause 52.215.6 Place of Performance.

73.    In late October 2020, at Mr. Kaplan's directive, Edgy Bees posted a job listing for a

position virtually identical to the one held by Mr. Hearn. This occurred at the time another set of milestones were to be invoiced and paid, and commissions paid out to Mr. Hearn.

74.    By December 2020, at Mr. Kaplan's directive, Edgy Bees hired a Caucasian employee (Michael Crouse) to replace Mr. Hearn.  Shortly thereafter, and despite holding the title of Global Business Development Director, Mr. Kaplan directed that Mr. Hearn be excluded from executive meetings and Business Development and Sales planning discussions.

75.    For no legitimate reason, Mr. Crouse demanded that Mr. Hearn provide information and updates on his (Mr. Hearn's) accounts. Mr. Hearn did not report, directly or indirectly, to Mr. Crouse.

76.    On December 11, 2020, Mr. Hearn and Mr. Crouse discussed issues about security Compliance, where Edgy Bees was at with obtaining their security clearance, and concerns about exchange of information back and forth to Israel.

77.    Also on December 11, Mr. Crouse sent a form to Mr. Hearn, asking him to complete it. The form was to verify to an integration partner that Edgy Bees was not sending information to Israel, and that there were firewalls in place to prevent such from happening.

78.    As he told Mr. Crouse, Mr. Hearn refused to complete the form because he could not verify the information and suspected that firewalls had never been put in place.  Upon information and belief, this refusal was relayed to Mr. Kaplan.

79.    During his employment, Mr. Hearn was the only African American employee.

80.    In its entire history, Edgy Bees has only employed one other African American – Reuben Sowell – whose employment also was terminated.

81.    On January 7, 2021, Mr. Hearn was terminated, and this decision was made by Mr. Kaplan. This opportunistic discharge enabled Edgy Bees and Mr. Kaplan to maximize profit and monetary advantage to their benefit and to Mr. Hearn's detriment.  Mr. Hearn was personally

called by Mr. Kaplan, without any Human Resources or other management representative.

82.   When Mr. Hearn asked for the reason of termination, Mr. Kaplan did not answer and informed him that a termination letter would be forthcoming.  Edgy Bees' proposed Severance Agreement lists no reason for Mr. Hearn's termination, nor was an alleged reason ever provided.

83.   Regarding Mr. Hearn's commissions payments, Edgy Bees only paid him $32,000 on September 15, 2020, $14,000 on December 31, 2020 and $24,800 on May 28, 2021.  Upon receiving the first payment and learning that the amount was less than his entitlement, Mr. Hearn stated via e-mail "I still disagree with the interpretation of the verbiage in the contract."

84.   When Mr. Hearn continued to question his commission amount, he was told by Ms. Maman that "It's up to Adam to decide what he wants to give you."

85.   Edgy Bees improperly eliminated 56 hours of paid time off, totaling $4038.44, on or about December 31, 2020.

86.   In addition to procuring and securing the STRATFi award, at the time of his opportunistic discharge, Mr. Hearn had numerous, multi-million dollar pending deals with the Philippines SOCOM, the Italian Ministry of Defense, the Greece Ministry of Defense, the Denmark Ministry of Defense and the UAE.  Moreover, Mr. Hearn had meetings scheduled at the Greek Embassy Ministry of Defense and the Italian Embassy Ministry of Defense the following week.

87.   It was Mr. Hearn's professional relationships and reputation that allowed Edgy Bees to secure these meetings, thereby lending further support to his claim that he was terminated for non-legitimate reasons. Upon information and belief, after his termination, these in-person meetings were canceled because no Edgy Bees personnel were authorized to attend.

88.   Edgy Bees benefitted, and continues to benefit, from Mr. Hearn's out-of-the-box

thinking. When Edgy Bees' product was not sufficiently developed to sell to the US government and only Research and Development contracts could be secured (but were no longer available), Mr. Hearn suggested to include another government agency for expansion into a completely separate product line. This allowed funding of a Research and Development effort to integrate the Edgy Bees technology into the U.S. Government Ariel Delivery platform (and potentially the international market as well). At that time, Edgy Bees only had used its software for drones, but not for situational awareness in Precision Air Drop.

89. Research and Development funding for Precision Air Drop allowed a new product line, and greatly improved situational awareness of the warfighter in Precision Air Drop situations. Mr. Hearn secured an agreement that was expected to provide $250,000 in immediate proof of concept funding with a potential follow-on $2.5M contract for full development and integration into a Broad Agency Announcement contract, as well as further potential product sales into the Ariel Delivery market segment within defense industries. Mr. Hearn convinced the U.S. government to permit Edgy Bees to participate in a very costly test session in November 2020, at no cost to Edgy Bees, to determine validity of the theory. This test session led to the creation of a Cooperative Research and Development Agreement. Edgy Bees would not have secured such an agreement and opportunity without Mr. Hearn's efforts and his connections in the industry.

90. Edgy Bees received $9.5M in seed A round funding in February 2021, one month after Mr. Hearn was terminated. Upon information and belief, Edgy Bees had not secured any additional contracts or revenue at that time.

## COUNT I
### (Breach of Contract)
### Defendant Edgy Bees

91. The factual allegations contained in paragraphs 1-90 are hereby incorporated by reference as if fully set forth herein.

92.     Plaintiff performed all of his contractual obligations owed to Defendant and "earned" his commission.

93.     There exists a contractual obligation owed by Edgy Bees to Mr. Hearn under which Edgy Bees is obligated, *inter alia,* to compensate Mr. Hearn.

94.     By engaging in the aforementioned conducting, including but not limited to nonpayment of commissions and failure to pay wages and benefits, Edgy Bees materially breached its contract with Mr. Hearn.

95.     As a direct and proximate result of Edgy Bees' breach, Mr. Hearn has suffered substantial damages in an amount of not less than $906,988.44, which will be proven at trial.

WHEREFORE, Plaintiff demands judgment in its favor and against Defendant Edgy Bees for damages in an amount not less than $906,988.44, the total amount of which to be proven at trial, plus pre- and post-judgment interest as permitted by law, costs, and such other and further relief as the Court deems just and proper.

## COUNT II
**(Breach of Implied Good Faith and Fair Dealing)**
**Defendant Edgy Bees**

96.     The factual allegations contained in paragraphs 1-90 are hereby incorporated by reference as if fully set forth herein.

97.     Plaintiff performed all of his contractual obligations owed to Defendant.

98.     Implied in every contract in Maryland is a covenant of good faith and fair dealing.

99.     Defendant was bound by the implied covenant of good faith and fair dealing in performing its contractual obligations owed to Plaintiff.

100.    Defendant breached the implied covenant of good faith and fair dealing and frustrated Plaintiff's justified expectations.

101.    By the acts and omissions alleged herein, Defendant has frustrated Plaintiff's right

to receive contractual benefits due to him.

102.  As a direct and proximate result of Edgy Bees' breach, Mr. Hearn has suffered

substantial damages in an amount of not less than $906,988.44, which will be proven at trial.

103.  Defendant's acts in breaching the implied covenant of good faith and fair dealing

constitutes action taken in bad faith which was willful and malicious, thereby justifying an award

of punitive damages.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant Edgy

Bees for damages in an amount not less than $906,988.44, the total amount of which to be

proven at trial, punitive damages in the amount of $500,000, plus pre- and post-judgment interest

as permitted by law, costs, and such other and further relief as the Court deems just and proper.

**COUNT III**
**(Quantum Meruit)**
**Defendant Edgy Bees**

104.  The factual allegations contained in the paragraphs 1-90 are hereby incorporated

by reference as if fully set forth herein.

105.  Valuable services were rendered to Edgy Bees by Mr. Hearn.

106.  The aforementioned services were accepted, used and enjoyed by Edgy Bees.

107.  As set forth above, the services were rendered under such circumstances that

reasonably notified Edgy Bees that Mr. Hearn, in performing such services, expected to be paid.

108.  As a direct and proximate result of Edgy Bees' acts and omissions, Mr. Hearn has

suffered substantial damages in an amount of not less than $906,988.44, which will be proven at

trial.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant Edgy

Bees for damages in an amount not less than $906,988.44, the total amount of which to be

proven at trial, plus pre- and post-judgment interest as permitted by law, costs, and such other and further relief as the Court deems just and proper.

## COUNT IV
**(Unjust Enrichment)**
**Defendant Edgy Bees**

109.  The factual allegations contained in the paragraphs 1-90 are hereby incorporated by reference as if fully set forth herein.

110.  Mr. Hearn conferred a benefit upon Edgy Bees.

111.  Edgy Bees knew or appreciated the benefit.

112.  Acceptance or retention by Edgy Bees of the benefit under such circumstances makes it inequitable for either to retain the benefit without payment of its value to Mr. Hearn.

113.  As a direct and proximate result of Edgy Bees' acts and omissions, Mr. Hearn has suffered substantial damages in an amount of not less than $906,988.44, which will be proven at trial.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant Edgy Bees for damages in an amount not less than $906,988.44, the total amount of which to be proven at trial, plus pre- and post-judgment interest as permitted by law, costs, and such other and further relief as the Court deems just and proper.

## COUNT V
**(Violation of Maryland Wage Payment and Collection Law.**
*Annotated Code of Maryland***, Labor & Employment Article, §3–501 *et seq*.**
**Defendant Edgy Bees and Kaplan**

114.  The factual allegations contained in paragraphs 1-90 are hereby incorporated by reference as if fully set forth herein.

115.  By failing to pay Mr. Hearn his earned "wages," Edgy Bees violated Maryland Labor & Employment Article, §3-501, *et seq.*

116.  As a result of Defendants' acts and omissions, Mr. Hearn has not been paid:

    a.  Payment on commissions for the STRATFi contract award, which was valued at $12million, in the amount of $889,200.00;

    b.  $13,750.00 resulting from the 2020 wage deferral; and

    c.  56 hours of paid time off, totaling $4038.44, that was improperly eliminated on December 31, 2020.

117.  As a direct and proximate result of Defendants' acts and omissions, Mr. Hearn has suffered substantial damages in an amount of not less than $906,988.44, which will be proven at trial.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendants, jointly and severally, for damages in an amount not less than $906,988.44, the total amount of which to be proven at trial, plus pre- and post-judgment interest as permitted by law, three times (3x) outstanding wages, punitive damages in the amount of $500,000.00, reasonable attorney's fees, costs, and such other and further relief as the Court deems just and proper.

### COUNT VI
**(Violation of 42 U.S.C. §1981 - Discrimination)**
**Defendant Edgy Bees and Kaplan**

118.  The factual allegations contained in paragraphs 1-90 are hereby incorporated by reference as if fully set forth herein.

119.  By and through his/its conduct, Defendants did not afford Plaintiff equal rights under the law and violated 42 U.S.C. §1981 by discriminating against Plaintiff on the basis of his race and/or color.

120.  Plaintiff is a member of a protected group.

121.  Defendants discriminated against Plaintiff in the termination of his employment on the basis of his protected group status.

122.  Defendant Kaplan intentionally engaged in acts and/or omissions in which he

authorized, directed or participated in a discriminatory act.

123.  There is no legitimate, non-discriminatory reason for Defendants' actions. Any purported reason offered is pretextual to mask unlawful discrimination.

124.  As a direct and proximate result of Defendants' acts and omissions, Mr. Hearn has suffered substantial damages in an amount of not less than $500,000.00, which will be proven at trial.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendants, jointly and severally, for damages in an amount not less than $500,000.00, the total amount of which to be proven at trial, pre- and post-judgment interest as permitted by law, punitive damages in the amount of $500,000.00, reasonable attorney's fees, costs, and such other and further relief as the Court deems just and proper.

### COUNT VII
### (Violation of 42 U.S.C. §1981 - Retaliation)
### Defendant Edgy Bees and Kaplan

125.  The factual allegations contained in paragraphs 1-90 are hereby incorporated by reference as if fully set forth herein.

126.  By and through his/its conduct, Defendants did not afford Plaintiff equal rights under the law and violated 42 U.S.C. §1981 by retaliating against Plaintiff.

127.  Defendant Kaplan intentionally engaged in acts and/or omissions in which he authorized, directed or participated in a retaliatory act.

128.  Plaintiff engaged in a protected activity.

129.  Defendants took a "materially" adverse action against Plaintiff.

130.  A causal connection existed between Plaintiff's activity and the adverse action taken against him.

131.  Defendants retaliated against Plaintiff in the termination of his employment on the basis of his protected group status.

132.  There is no legitimate, non-discriminatory reason for Defendants' actions. Any purported reason offered is pretextual to mask unlawful discrimination.

133.  As a direct and proximate result of Defendants' acts and omissions, Mr. Hearn has suffered substantial damages in an amount of not less than $500,00.00, which will be proven at trial.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendants, jointly and severally, for damages in an amount not less than $500,000.00, the total amount of which to be proven at trial, pre- and post-judgment interest as permitted by law, punitive damages in the amount of $500,000.00, reasonable attorney's fees, costs, and such other and further relief as the Court deems just and proper.

## COUNT VIII
### (Violation of Montgomery County Code §27-19)
### Defendant Edgy Bees

134.  The factual allegations contained in paragraphs 1-90 are hereby incorporated by reference as if fully set forth herein.

135.  By and through its conduct, Defendant did not afford Plaintiff equal rights under the law and violated Montgomery County Code §27-19 by discriminating against Plaintiff on the basis of his race and/or color.

136.  Plaintiff is a member of a protected group.

137.  Defendant discriminated against Plaintiff in the termination of his employment on the basis of his protected group status.

138.  There is no legitimate, non-discriminatory reason for Defendant's actions.  Any

purported reason offered is pretextual to mask unlawful discrimination.

139.  As a direct and proximate result of Defendant's acts and omissions, Mr. Hearn has suffered substantial damages in an amount of not less than $500,000.00, which will be proven at trial.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant for damages in an amount not less than $500,000.00, the total amount of which to be proven at trial, pre- and post-judgment interest as permitted by law, punitive damages in the amount of $500,000.00, reasonable attorney's fees, costs, and such other and further relief as the Court deems just and proper.

## COUNT IX
### (Violation of False Claims Act – Retaliation)
### Defendant Edgy Bees

140.  The factual allegations contained in paragraphs 1-90 are hereby incorporated by reference as if fully set forth herein.

141.  The False Claims Act protects employees, contractors, and agents who engage in protected activity from retaliation in the form of their being "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment." 31 U.S.C. § 3730(h)(1).

142.  Mr. Hearn served as an employee, contractor and/or agent of Edgy Bees, a federal contractor.

143.  Through Mr. Hearn's acts and disclosures, he tried to prevent one or more violations of the False Claims Act by Edgy Bees.  Through Mr. Hearn's acts and disclosures, he engaged in protected activity.

144.  Mr. Hearn had an objectively reasonable belief that Edgy Bees was violating, or

would soon violate, the False Claims Act.

145.   As a result of his acts and disclosures, Mr. Hearn was terminated from employment at Edgy Bees and not paid his commissions.

146.   As a result of Edgy Bees' acts and omissions, Mr. Hearn has suffered substantial damages in an amount of not less than $1,000,000.00, which will be proven at trial.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant Edgy Bees for damages in an amount not less than $1,000,000.00, the total amount of which to be proven at trial, double back pay (lost wages and benefits) with interest, plus pre- and post-judgment interest as permitted by law, emotional distress and other non-economic harm from the retaliation, reimbursement of reasonable attorney's fees, costs, and such other and further relief as the Court deems just and proper.

### *Jury Demand*

Plaintiff demands a trial by jury to the maximum extent permitted by law.

Respectfully submitted,

Marc E. Pasekoff, Esquire
Kalijarvi Chuzi Newman & Fitch, P.C.
818 Connecticut Avenue, N.W., Suite 1000
Washington, D.C. 20006
Tel: 202-331-9260
Fax: 1-855-326-5993
Email: mpasekoff@kcnlaw.com