## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Southern Division

———————————————————

**VINCENT HEARN**

    Plaintiff,

       v.

**EDGY BEES INC., et al.**

    Defendants.

———————————————————

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 8:21-cv-02259-GJH

### <u>FIRST AMENDED COMPLAINT</u>

Pursuant to Judge Hazel's directions at ECF No. 28, ¶ 3, and ECF No. 35, Plaintiff, VINCENT HEARN, for his First Amended Complaint against Defendants EDGY BEES INC., et al. states the following:

### <u>Introduction</u>

1.    Plaintiff VINCENT HEARN ("Plaintiff" or "Mr. Hearn"), began working for Defendant EDGY BEES INC. and its President, Adam Kaplan, on November 1, 2019, as their Global Business Development Director. During this time, Mr. Hearn observed and reported that Defendants were violating numerous national security laws and regulations intended to protect classified information and technology and prevent its unauthorized transfer to foreign entities. Mr. Hearn, who was the Defendant's only African American employee, also observed that Defendants treated him adversely compared its White employees. After Mr. Hearn raised his concerns about the security violations and unlawful discrimination, Defendants fired him on January 7, 2021.

1

Defendants also failed to pay him the wages and commissions due to him. In this action, Mr. Hearn seeks his lawful remedies for Defendants' violations of wage payment, whistleblower protection and anti-discrimination laws, and for breach of contract.

## Parties

2. At all relevant times, Plaintiff VINCENT HEARN ("Plaintiff" or "Mr. Hearn") was an Arizona resident having a principal address at 4854 E. Charleston Avenue, Scottsdale, Arizona 85254.

3. Defendant EDGY BEES INC. ("Edgy Bees"), upon knowledge and belief, is a Delaware corporation authorized to do business in the State of Maryland as a foreign corporation with its principal place of business located at 9841 Washingtonian Blvd., Suite 220, Gaithersburg, Maryland. At all relevant times, Edgy Bees was aware of, ratified and confirmed the actions of its employees, agents, subcontractors and representatives.

4. Defendant ADAM KAPLAN ("Mr. Kaplan"), is an individual who at all times relevant herein was, a resident of Israel. Mr. Kaplan is now, and at all relevant times was, the Chief Executive Officer of Edgy Bees. Mr. Kaplan and Edgy Bees are collectively referred to hereinafter as "Defendants."

## Jurisdiction

5. The Court has subject matter jurisdiction over the federal subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 31 U.S.C. § 3730(h)(2). Plaintiff is a resident of Arizona; Defendant Edgy Bees is a Delaware corporation with its principal places of business in Maryland and Israel, and Defendant Mr. Kaplan is a resident of Israel. Additionally, the amount in controversy exceeds the sum or value of $75,000.00,

exclusive of interests and costs. The Court has jurisdiction over the remaining state common law subject matter of this action pursuant to 28 U.S.C. § 1367(a).

6. This Court has personal jurisdiction over Edgy Bees because, *inter alia*, Edgy Bees conducts business from its offices Gaithersburg, Maryland – its only office in the United States. For tax purposes, Edgy Bees treats its employees as being employed in the State of Maryland. Both defendants conduct periodic meetings with employees in its Gaithersburg offices and direct employees to attend such meetings. This Court has personal jurisdiction over Mr. Kaplan because, prior to COVID and at relevant times herein, he regularly spent business days working in Gaithersburg, Maryland, thus purposefully availing himself of the laws and benefits of Maryland. In addition, Defendants have committed multiple tortious acts within the state of Maryland, thus availing themselves to the jurisdiction of this state.

7. Mr. Kaplan is a US Citizen.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims set forth herein occurred in this District.

## Factual Background Common to All Counts

9. Mr. Hearn is a United States Air Force retiree and Purple Heart recipient. Mr. Hearn held a Top-Secret SCI ("Sensitive Compartmented Information") Security Clearance during his service in the military. While stationed in Germany, Mr. Hearn received the Cavalier de Strause award, the highest award given to any non-German citizen, directly from the German government for saving the lives of two women.

10. Mr. Hearn is a 70% US Service-Disabled Veteran due to his combat related injuries.

11. Anticipating military retirement but still committed to serving his country, Mr. Hearn began working in the federal contract procurement field while still in the military; he attained a Level 2 certification from the Air Force Institute of Technology in Procurement & Acquisition Management.

12. After retiring from the Air Force, Mr. Hearn transitioned his military and contracting expertise to a civilian career within federal contracting, holding key executive level positions with Dynamics Research Corporation, and Harris Corporation. Mr. Hearn was appointed by Secretary of Defense William Perry to lead the federal division of a classified startup named Xyterra Computing in Scottsdale, Arizona. After September 11, 2001, when funding on the program was lost, Mr. Hearn transitioned to Contract Acquisitions Group and the Contract Defense Group where he oversaw all government sales and was employed there for 8 years. Here, Mr. Hearn gained invaluable experience in selling to the US Government, managing all aspects of contracts and understanding FAR & DFAR regulations.

13. In 2014, Mr. Hearn moved to Wamore, Inc, a federal contracting company specializing in precision air drop for the US Government and US foreign allies – initially as its contract manager, and then as its Director of Business Development and Foreign Military Sales Program. In the five (5) years that Mr. Hearn worked with Wamore, he became ITAR and EAR certified, won International Contractor of the Year for the company by the state of Arizona, and brought in $46M in US Government contracts and $62M in foreign military sales deals.

14. ITAR stands for International Traffic in Arms Regulations. It is a United States regulatory regime to restrict and control the export of defense and military related

technologies to safeguard U.S. national security and further U.S. foreign policy objectives.  EAR indicates that a particular item is subject to the US Export Administration Regulations.   Edgy Bees properly determined in 2018 that its products are subject to EAR99 regulations.  Mr. Hearn's ITAR/EAR certification required specialized training in the U.S. Governments interest in and means of enforcing regulations that restricted the flow of defense and military technology to other countries. Mr. Hearn received training and Level 2 certification in Procurement & Acquisition Management from the Air Force Institute of Technology. He has over forty (40) years working in US DoD and federal government startup, Airobotics. In only six (6) months, Mr. Hearn secured $117M in qualified opportunities, both domestic and international. Thereafter, UAV lost its startup funding, laid off its workforce and shut down its US/Arizona operations.

15. On September 25, 2019, Mr. Hearn applied for a position with Edgy Bees as its Business Development Director.

16. On October 18, 2019, Mr. Kaplan invited Mr. Hearn to fly to San Diego to meet with him for an initial interview. Mr. Kaplan was extremely interested in Mr. Hearn's contacts and set up interviews for him with multiple Edgy Bees personnel

17. October 27, 2019, Mr. Kaplan discussed a compensation package with Mr. Hearn and offered him a position. On October 28, 2019, as directed by Mr. Kaplan, Mr. Hearn flew to Israel to meet with additional Edgy Bees personnel and begin employment. Edgy Bees hired Mr. Hearn, effective November 1, 2019, as its Global Business Development Director.

18. Mr. Kaplan verbally negotiated an employment offer with Mr. Hearn and delivered a draft Offer Letter via email on November 5, 2019, dated November 1, 2019. See Exhibit 1 at ECF No. 1-1. The Offer Letter referenced a "written compensation plan" that would be provided to Mr. Hearn. The Offer Letter stated that the terms of Mr. Hearn's employment shall be governed by the law of the State of Maryland.

19. Mr. Hearn brought to Edgy Bees his expansive list of contacts in the Department of Defense and foreign military sales arena, the existing opportunities in the UAV industry, his years of experience selling into the US government and foreign military sales markets, as well as his contract administration and management expertise. No one at Edgy Bees had Mr. Hearn's skills and connections.

20. Recognizing Mr. Hearn's immediate value, Mr. Kaplan began contacting Mr. Hearn prior to Mr. Hearns official start date. Even before his official first day, Mr. Kaplan began e-mailing information to Mr. Hearn regarding an upcoming proposal for a particular Air Force contract (the AFWERX/US Air Force SBIR Phase II STRATFi) via his personal e-mail.

21. The agreement between Mr. Hearn and Edgy Bees governing non-discretionary payment of commission was set forth in Edgy Bees' Individualized Compensation Plan, which Mr. Hearn received on Sunday, January 19, 2020. See Exhibit 2, ECF No. 1-2. The Individualized Compensation Plan has no eligibility requirements and provided, *inter alia*:

> Commissions will be calculated in accordance with the incentive schedules and based on the following percent, out of Recognized Revenue from a Qualified Sale based accounting which assigned by the company.

It is hereby clarified that Commissions will only be paid to Participants after the Company has received payment from the customer for the New Sales or the Renewals.

22. The Individualized Compensation Plan provided for the following commission payments:

| Aggregate Attributable Contract Proceeds (in Contract US $) Service | % of Attributable Proceeds Payable to Provider |
|---|---|
| Up to $2,000,000 | 4% |
| Between $2,000,000 to $4,000,000 | 6% |
| Above $4,000,000 | 8% |

23. Edgy Bees also provided a second, inconsistent compensation plan – the Sales Compensation Plan. Exhibit 3, at ECF No. 1-3.

24. Under Section III of the Sales Compensation Plan, both "employees" and "service providers" are included as a "Participant," but neither term is separately defined. In this document, and in subsequent communications from Edgy Bees, Mr. Hearn is referred to as both an "employee" and a "service provider."

25. Neither the Individualized Compensation Plan nor the Sales Compensation Plan limits the employee's commission to the portion of a contract paid by the government. Both provide for the commission to be computed from the total value of the contract.

26. Mr. Hearn met all other eligibility requirements set forth in Section III of the Sales Compensation Plan.

27. Under the Sales Compensation Plan, "compensation" is defined as "all Commissions or other payments potentially due under the Plan." "Recognized revenue" is defined as "Compensation."

28. Throughout his employment and continuing until his termination on January 7, 2021, Mr. Hearn was subjected to different and less favorable treatment, including verbal abuse at

Monday morning sales meetings. Mr. Kaplan routinely called and texted Mr. Hearn at all hours of the night and on the weekends, especially on Sunday when he knew Mr. Hearn attended church with his family. Likewise, Mr. Kaplan regularly scheduled meetings for Mr. Hearn on Sunday mornings and holidays.

29. Unlike other management personnel, Mr. Hearn was not provided with a company credit card. Mr. Hearn was required to place significant travel expenses on his personal credit card and wait a substantial time for reimbursement. Though requested otherwise by Mr. Hearn both verbally and in writing on numerous occasions, Edgy Bees, at the direction of Mr. Kaplan, did not treat Mr. Hearn as it did other similarly situated employees, and caused him undue financial stress and harm.

30. Throughout November, immediately after his hire, Mr. Hearn flew to numerous locations and met with numerous potential funding candidates. In performing his duties for Defendants, Mr. Hearn traveled to, and worked in, the State of Maryland on the following dates:

> 2019 Nov 11-13
>
> 2019 Nov 25-26
>
> 2020 Jan 1-3
>
> 2020 Jan 9-10
>
> 2020 Jan 20-23
>
> 2020 Jan 28-31
>
> 2020 Feb 25-26
>
> 2020 Aug 4-7

28. Defendants permitted and authorized Mr. Hearn's travel on the dates listed above.

Defendants also reimbursed Mr. Hearn for his travel to Maryland on the dates listed above, as per his Offer Letter. Several of Mr. Hearn's trips to Maryland were for the purpose of attending meetings called by Mr. Kaplan to meet with him in the Gaithersburg office.

29. For calendar year 2019, Defendant Edgy Bees, Inc. reported to federal and Maryland tax authorities that it paid Plaintiff $24,694.32 for Mr. Hearn's employment in the State of Maryland. For calendar year 2020, Defendant Edgy Bees, Inc. reported to federal and Maryland tax authorities that it paid Plaintiff $170,232.32 for Mr. Hearn's employment in the State of Maryland. Defendants did not report any wages paid to Plaintiff for employment in any state other than Maryland.

30. On March 10, 2020, Defendants informed their employees that all travel was grounded due to Covid-19 safety concerns.

31. On March 15, 2020, Defendants' human resources officials informed all their employees that they were now considered "Remote" and working from home. For the remainder of Mr. Hearn's employment with the Defendants, he regularly participated in teleconferences with other employees, including those in Maryland.

32. On or about November 27, 2019, Mr. Hearn learned that the STRATFi program required a minimum of $3M in government commitment to permit proposal submission, which was due on December 16. As of December 9, Mr. Kaplan had tried, but failed, to get funding commitments from any potential customers or contacts, and turned this task over to Mr. Hearn.On November 27, 2019, Edgy Bees prepared a Press Release to introduce the new hires in the company.  The Director of Marketing emailed Mr. Kaplan to approve the release, Mr. Kaplan responded with:  "If we are going to put out this press release it

should be only Vince. The Israel side needs to be de- emphasized as we are under heavy scrutiny because of the SBIR program. We need to Americanize our site."

33. Mr. Hearn worked to prepare Edgy Bees' proposal for the Stage 2 proposal for STRATFi submission to the US Air Force AFWERX ("AFWERX") program office (submitted December 16). By the end of 2019, Mr. Hearn had prepared a timeline for visiting government customers to secure funding, as well as setup milestones for the final proposal which was due February 12, 2020.

34. On January 9, 2020, Mr. Hearn met with Russ Sinclair, U.S. Special Operations Command (SOCOM) Project Manager regarding funding of 27th Special Operations Group (SOG) program for STRATFi.

35. Because of Mr. Hearn's efforts, Edgy Bees was notified on January 11, 2020 that it was selected to participate in the full/final Proposal Process. The next day, Mr. Hearn organized and led an internal preparation meeting ahead of the discussion with the AFWERX program office.

36. On January 13, 2020, the AFWERX program office sent Mr. Hearn additional instructions for the Phase II STRATFi proposal. On January 16, 2020, he participated in the AFWERX discussion for Edgy Bees as part of the Stage 3 of the Proposal process. Over the next three (3) weeks, Mr. Hearn oversaw proposal finalization. On February 7, 2020, Mr. Hearn participated in a second AFWERX question session.

37. On February 28, 2020, Mr. Hearn had an additional meeting with Mr. Sinclair, who agreed to fund the contract.

38. On March 10, 2020, Edgy Bees received a preliminary notification of award on the STRATFi contract from the AFWERX program office. However, work still needed to be done before the final award was delivered.

39. On April 3, 2020, Mr. Hearn prepared and sent the kickoff draft to prepare for the contract negotiation.

40. On April 7, 2020, Mr. Hearn was introduced to the government official, Jonathan Bearce, Contracting Officer and Procurement Analyst for the US Air Force, to start the negotiation and due diligence process in order to secure a contract start and final award. On April 9, the cost proposal submitted by Mira Maman, Edgy Bees' Chief Financial Officer, was rejected by Mr. Bearce and a complete revision was requested.

41. From April 9 through July 1, 2020, Mr. Hearn undertook almost a daily effort to revise the Milestone Sheet, and the Cost Proposal. After seven (7) revisions of the Cost Proposal, multiple extensive Q&A emails exchanged with Mr. Bearce, explanation and documentation of private investments, multiple milestone revisions, research and analysis of matching costs and working with the US SOCOM Program Office, the final proposal submission was accepted.

42. On July 1, 2020, Mr. Hearn was personally notified by the Air Force contracting officer that Edgy Bees was officially awarded the STRATFi contract, valued at $12 million USD.

43. Soon thereafter, on July 7, 2020, Mr. Kaplan sent an e-mail to the team stating "Congrats to all -especially to Vince."

44. The award of the STRATFi contract was for the development of Edgy Bees Augmented Reality GIS Underlay System (ARGUS) on the US Air Force MQ-9 Drone program,

which was a national defense-related program.  Specifically, Edgy Bees software

provides data fusion and visualization for improving situational awareness of the

battlespace, accelerating cognitive integration, and overcoming uncertainty in combat in

GPS denied environments.  Not only does the award involve work on the US MQ-9 drone

software and integration into its, and other US contractors', software, but the

development and progress of the award requires access to the highly classified US Air

Force ATO network, necessitating the need for engineers on the project to be ONLY US

citizens with a US Top Secret Clearances.

45. Within the STRATFi proposal and award, Edgy Bees listed a number of milestones that

had to be achieved to invoice the US Government for payment. Along with the Program

Manager, Mr. Hearn developed the list of milestones to deliver to the U.S. Air Force's

Contracting Officer. These milestones lined up the work that was done, and the Edgy

Bees costs associated with it.  Each time a milestone was completed, the US Air Force

certified that the milestone was complete, and by invoicing the government, Edgy Bees

certified that it incurred the costs they claimed were associated with that milestone, and

that they did so while complying with ITAR and EAR regulations.

46. Later in July, the first Milestone payment of $800,000 was invoiced to the government,

but when a commission payment to Mr. Hearn was due, Mr. Kaplan sent an e- mail to

Mr. Hearn attempting to take credit for the award. Only after Mr. Hearn responded with a

lengthy recitation of his efforts, Mr. Kaplan admitted, "I am not taking credit for the

STRATFi deal which you indeed led to close."

47. In 2018, Edgy Bees hired Ms. Selina Hayes as a Director of Business Development,

through her company The Hayes Group.  Her Commission Agreement structure was

similar to Defendants' agreement with Mr. Hearns. Mr. Kaplan tasked her with preparing the proposal for the AFWERX SBIR Phase 1 contract.  During the months of June 2018 through October 2018, Ms. Hayes drafted approximately 12 proposal drafts for the AFWERX SBIR Phase I contract, with a potential for generating over $2,000,000 in revenue for Edgy Bees. Indeed, the effort was successful and the U.S. Air Force awarded the contract to Edgy Bees.  Mr. Kaplan, although having little to no involvement in the writing or awarding of the contract, took credit for the award, and continues to take credit for it.  In the year following, Mr. Kaplan refused to pay Ms. Hayes her commission due for the awarded contract.  In November 2020, Ms. Hayes sued Edgy Bees and Mr. Kaplan in the U.S. District Court for Southern California (case number 3:20-cv-02336-W-JLB) for the non-payment of commission and breach of contract. Defendants' treatment of Ms. Hayes shows a repetition of Mr. Kaplan taking credit for other peoples work and is evidence of his intent, preparation, and knowledge of his intent to breach agreements for commissions, and is also evidence of his lack of any mistake.

48. Without Mr. Hearn's combination of sales experience and federal contract management combined, Edgy Bees would not have closed the STRATFi $12M contract and would not have secured the award. This deal was Edgy Bees' only significant revenue in 2020 and the largest in the company's history to date.

49. In order for the U.S. government to award the STRATFi contract, Edgy Bees was required to secure private investor matching, equal to the government funded amount. Thus, the total contract value was $12M. By August 2020, Edgy Bees had received and disclosed to the government at least $4.7M in private investor funding directly related to the contract Mr. Hearn closed.

50. In June 2020, Mr. Kaplan directed that he and Mr. Hearn set up weekly 1x1 meetings. However, while Mr. Kaplan canceled a majority of his weekly scheduled meetings with Mr. Hearn, he maintained his weekly 1x1 meetings with other employees. Whenever Mr. Hearn tried to contact Mr. Kaplan, Mr. Kaplan would claim that he was traveling or in meetings. However, he was regularly available to other employees.

51. In March 2020, many employees – including Mr. Hearn – were asked to defer wages. By July2020, however, Mr. Hearn discovered that while all other employees had returned to their regular wages at Mr. Kaplan's direction he was the only one whose wages had not been restored. Unlike the others, Mr. Hearn had to wait until September to receive regular wages - and only after repeated requests to Mr. Kaplan (who was the only Edgy Bees official who had authorization to correct his pay). Unlike the other employees and under the direction of Mr. Kaplan, Mr. Hearn still has not received his deferred wages which total $13,750.

52. Moreover, this non-payment of wages is inconsistent with Mr. Kaplan's contemporaneous demand that Mr. Hearn undertake additional duties. No other employee had a similar accretion of duty involuntarily imposed without compensation.

53. In July 2020, Edgy Bees characterized $6M of the STRATFi contract as "recognized revenue" which, in part, bolstered its balance sheet and allowed Edgy Bees to secure a total of $9.5M in private investor funding ($6M of which was directly related to, and only to be used for, work on the STRATFi contract per the US Air Force and AFWERX guidelines and regulations of this contract). Prior to award, and as an eligibility requirement of the proposal, Edgy Bees had to prove its ability to contribute $6M in private investment funding to be allocated to this total contract award and is considered

14

part of the contract award value according to the AFWERX program office. This funding was certified by the Government Contracting Officer prior to award, via notarized letters, from the private investors confirming their investment into the STRATFi contract.

54. Under Section IV(A)(1) of the Sales Compensation Plan (Exhibit 3 at ECF No. 1-3):

> New Sales Commissions are paid by the Company to Participant 30 days after the quarter in which a Qualified Sale becomes a Recognized Revenue.

55. In July 2020, although the company was in a "Remote Work" mode due to COVID, Mr. Kaplan denied Mr. Hearn permission to work remotely outside of his home, while accompanying his family on vacation. Yet, the Director of Programs in Maryland, Sheffy Glassberg (Caucasian), was permitted to do so at the same time.

56. Mr. Hearn repeatedly expressed his concerns regarding unequal treatment by Mr. Kaplan to Mr. Glassberg, who suggested that Mr. Hearn speak with Human Resources. In mid-August 2020, Mr. Hearn had a teleconference with the Human Resources Director, Moran Taichler, to discuss these issues and concerns, including his concerns about discrimination. Ms. Taichler promised to discuss the concerns with Mr. Kaplan.

57. In August 2020, Mr. Hearn disclosed his concerns to Trevor Matz (Executive Director of the Edgy Bees Advisory Board) that Mr. Kaplan was prejudiced and was targeting him. Mr. Matz agreed that Mr. Hearn was treated differently yet stated their conversation would never be spoken of or repeated again.

58. Per the STRATFi contract, and to work on the highly sensitive MQ-9 drone program, its software systems, additional government contractors software systems, and the US Air Force Classified ATO Network, Edgy Bees was required to obtain a U.S. Secret Facility Clearance and hire US employees with a Secret Clearance. Each time Edgy Bees certified

completion of a milestone, invoiced the US government and was paid, it was doing so knowing that it was not in compliance with the FAR and DFAR regulations of the contract. In addition, Defendants were also knowingly not using the funds that government awarded to them for related milestones. Edgy Bees was thereby defrauding the U.S. government by claiming compliance and violating the False Claims Act (FCA), 31 U.S.C. § 3729, and sequence.

59. The Edgy Bees contract with the U.S. Air Force requires that Edgy Bees have a Facility Security Clearance and hire US secret clearance engineers in the US to work on the contract because work is performed on classified systems within the US Air Force such as the highly sensitive MQ-9 drone program.

60. Although Mr. Hearn was hired for Business Development, based on his contract management experience, and certifications regarding defense related exporting, Mr. Hearn disclosed and cautioned Edgy Bees management, including Mr. Glassberg, Ms. Taichler and Mr. Kaplan, that Edgy Bees was violating the FARs, DFARs and the STRATFi contract itself regarding its handling US Air Force sensitive information, (i.e. ("NOFORN:" no foreign eyes on sensitive information)).

61. Edgy Bees' management system was required to prevent unauthorized disclosure of classified and sensitive unclassified information, and the US government was to be immediately notified if any security incident or any indication of a potential unauthorized disclosure or compromise of classified or sensitive unclassified information.

62. On numerous occasions, however, Mr. Hearn disclosed to Mr. Glassberg a specific FAR regulation (FAR Clause 5352.204-9000 which governs facility clearance for working on

classified programs) for which Edgy Bees was violating and about which Mr. Glassberg was worried.

63. At the time of Mr. Hearn's termination, most of Edgy Bees' engineering, development, and invention work remained in violation of the FARs, DFARs and the STRATFi contract as Mr. Hearn had disclosed to Mr. Glassberg, Michael Crouse (Mr. Hearn's replacement), Mr. Kaplan, Mr. Menashe Haskin (co-founder and head engineer in Israel), and Mr. Matz. However, in blatant violation of the requirements of the contract, , although much of the engineering work was being performed in Israel, Edgy Bees repeatedly assured the AFSOC/US SOCOM Program Managers, in Mr. Hearns presence, that it hired US engineers and planned to hire eleven (11) engineers charged to this contract.

64. Additionally, in the Private Funding Cost Plan sent to and approved by Mr. Bearce of the Air Force, Edgy Bees represented that it would hire Field Support Engineers, Field Test Team, Product Manager, Research & Development Lead with security clearances, and security cleared software developers, in concert with hiring a US Government Cost Accountant and a Contract Administrator, all to be employed within the United States. This was also false.

65. The Work Plan and Private Funding Investment schedule which Edgy Bees provided to the contracting officer before the contract award (to confirm what Edgy Bees would be doing with the contract money) informed the US government that in FY2020, Edgy Bees would hire classified US engineers, and multiple other positions in the United States to work exclusively on this contract. However, Edgy Bees cut the hours of Mr. Jerry Heyman, its only US-born, non-dual citizen engineer capable of obtaining a Secret

Security Clearance, who was the US Software Team Lead. Edgy Bees then transferred most of the work to the team in Israel. Mr. Hearn disclosed to Mr. Glassberg and Ms. Taichler his concerns that these contract requirements were not being met, and that, pursuant to FAR Clause 252.204-7012 Safeguarding Covered Defense Information and Cyber Incident Reporting is included in the contract. Edgy Bees needed to hire a US engineering team to work on the sensitive unclassified parts of the contract.

66. In violation of the contract and FAR requirements, Edgy Bees never disclosed to the US government that information would be transferred back and forth to Israel. Upon information and belief, Mr. Kaplan was fully aware of this violation.

67. On July 7, 2020, Mr. Kaplan, in an effort to exclude Mr. Hearn from Edgy Bees process of transferring work to Israel without detection by or approval from the U.S. government, sent an email stating that Ms. Taichler would henceforth be in charge of this process. On July 8, 2020, Ms. Taichler informed Mr. Hearn that she and Mr. Haskins were taking over his duties as a Facility Security Officer (FSO) for which he needed approval from the Defense Counterintelligence and Security Agency (DCSA). However, these duties could not be performed by foreign citizens, and no other individual in Edgy Bees had the required experience with the security clearance process.

68. At the time Mr. Hearn was terminated on January 7, 2021, and six months after its receipt of the contract award and funding, Defendant Edgy Bees still had not hired anyone in the US. Instead, its only US-born citizen employee was the US Software Team Lead, Dr. Jerry Heyman, who was the only employee legally capable of filling the requirements set out in the contract. His hours were reduced and he subsequentially left the company on November 27, 2020. Edgy Bees' nevertheless made false certifications to the US

government that its use of U.S. government funds was in compliance with applicable national security laws and regulations.

69. In July 2020, Mr. Hearn stated to Edgy Bees officials that Edgy Bees was required to hire a Facility Security Officer (FSO) consulting company to assist in securing a Facility Clearance and employee Secret Clearances for the US team. As part of this process, Edgy Bees also was required to appoint an internal FSO to facilitate information exchange between the FSO consultants and the company. For Edgy Bees to obtain security clearances for its personnel, the company had to secure a Facility Security Clearance at the same level; however, Edgy Bees was owned by a foreign parent company, which could not have access to classified information.

   a. The Defense Counterintelligence Security Agency (DCSA) requires foreign owned companies to fill out a formal Foreign Ownership, Control & Interest form, as well as a Special Security Agreement (SSA). The DCSA requires a number of firewalls and controls between Edgy Bees and its foreign owned parent company. Edgy Bees is required to implement both a Technology Control Plan (TCP) and an Electronic Control Plan (ECP), which impose controls to ensure no unauthorized access by the parent to classified or sensitive unclassified information.

   b. DCSA also prohibits any "shared services" between the two entities, unless such shared service has been disclosed and approved by DCSA. Edgy Bees was required to implement an Affiliated Operations Plan (AOP), describing any proposed shared services and its plan to mitigate the risk associated with the shared service.

   c. Mr. Hearn saw the information Mr. Kaplan provided for the TCP and recognized that it omitted the material facts that the Edgy Bees owners and investors were citizens of

Israel. Mr. Kaplan certified that he, a US Citizen, was the owner of Edgy Bees, Inc. Although Mr Kaplan is a dual US and Israeli citizen, he is not the sole owner or investor of Edgy Bees.

d.  Mr. Hearn knew from his training that information regarding the citizenship of  the owners is material to the Defense Department because of its national security interest in preventing the unauthorized flow of defense technologies to other countries, including Israel. Mr. Hearn also knew from his ITAR/EAR training that it was of vital national interest that work performed in defense technology be done in the United States in Sensitive Compartmented Information Facilities (SCIFs). These requirements safeguard U.S. military technologies from falling into foreign countries without authorization.

e.  Mr. Hearn observed that after the contract had been awarded, Defendants were laying off engineers employed in the U.S. and transferring their work to engineers in Israel, although the contract expressly required the use of US engineers. Mr. Hearn reasonably believed that this transfer of work from the U.S. to Israel was inconsistent with the applicable regulations and placed the U.S. military technologies at risk of being transferred to Israel without authorization – transfers that would be materially adverse to U.S. government interests, as well as inconsistent with language stated in the award contract requiring US engineers.

70. Mr. Hearn reasonably believed that Edgy Bees officials including Mr. Kaplan intended to defraud the US government, in order to secure its required clearance and to secure its payment, by representing it was not owned by a foreign entity and that Mr. Kaplan was the sole owner.

71. As part of the Facility Clearance process, Edgy Bees was required to establish three internal positions to be held by key management employees. These positions were Facility Security Officer, Assistant Facility Security Officer and Insider Threat Program Security Officer. These employees, among other eligibility criteria, were required to be US citizens and could not be dual citizens. Mr. Hearn was the only Edgy Bees employee qualified to hold these positions, and Mr. Glassberg recommended to Mr. Kaplan, Mr. Haskins and Ms. Taichler that Mr. Hearn be appointed. In September 2020, the consulting company notified Mr. Glassberg and Mr. Hearn of some of the requirements of the internal FSO, as well as some of the documentation that would be needed for the identified key personnel in the company.

72. At a minimum, the internal FSO had to be a Key Management Employee and US born citizen. Mr. Hearn was recommended because he was a Key Employee, the only US born citizen in the company, the only non-dual citizen, the only employee who had held a US Top Secret SCI Security Clearance, and the only employee with any US military, DoD, contracting or government program management experience. This position serves as a watchdog on behalf of the US Government to ensure that the company was complying with its security clearance requirements.

73. In September 2020, Mr. Hearn sent an email to Mr. Glassberg identifying his serious concerns regarding the information the FSO was requesting, and what Edgy Bees would need to provide to comply. Mr. Glassberg indicated via email that he already spoke to Mr. Kaplan, Mr. Matz, and Mr. Haskins regarding these concerns.

74. As Edgy Bees started to assemble the documentation it would submit for the clearance process, the FSO consulting company indicated it would require multiple corporate

documents for initiation and setup. Although Mr. Hearn was charged with transferring confidential corporate documents to the FSO consulting company, Mr. Kaplan intentionally excluded him and asked Mr. Glassberg and Ms. Maman to handle the transactions.

75. Suspecting that information in the documents would be either incorrect or incomplete, thereby raising the potential to defraud the US government, in October 2020, Mr. Hearn disclosed to Edgy Bees officials Mr. Glassberg and Ms. Taicher that providing false information was not acceptable and would place Edgy Bees in breach of its government contract.

76. Notwithstanding Mr. Hearn's disclosures, Mr. Kaplan directed that a) documents provided to the FSO would omit information concerning owners, board members and investors (because some were not U.S. citizens and/or foreign owned entities); and b) Mr. Hearn would be excluded from executive meetings and from the documentation process that would require him to verify the security protection for the US Government.

77. Per FAR regulation 52.204.17 Ownership & Control, Edgy Bees stated in its registration with the US Government as a federal contractor in the System for Award Management (SAM) that it did not have an immediate owner and was owned by a foreign entity. This requirement is material to the Defense Department because it assists the Department in assuring that military technology in the hands of contractors is not transferred without authorization to foreign countries, including Israel.

78. However, Defendant Edgy Bees did not register its parent company, a foreign entity called Edgy Bees, Ltd, within the SAM system and did not provide the applicable NCAGE code. Edgy Bees officials were aware that the foreign nature of this parent

company would deter U.S. government agencies from approving its facility security clearance and information being transferred to the FSO consulting company. In these documents, Mr. Kaplan was identified as the sole owner.

79. Edgy Bees, Inc falsely certified to the US Government in its annual Representations and Certifications filing ("Reps & Certs") to the U.S. government that it "DID NOT INTEND" to do any work on any government contract in a different place of performance than the address listed on its SAM registration. This representation was false and a violation of FAR Clause 52.215.6 Place of Performance.

80. In late October 2020, at Mr. Kaplan's direction, Edgy Bees posted a job listing for a position virtually identical to the position then held by Mr. Hearn. This occurred at the time another set of milestones were to be invoiced and paid, and commissions paid out to Mr. Hearn.

81. In or about December 2020, at Mr. Kaplan's direction, Edgy Bees hired a Caucasian employee (Michael Crouse) to replace Mr. Hearn. Shortly thereafter, Mr. Kaplan directed that Mr. Hearn, Edgy Bees' Global Business Development Director, be excluded from executive meetings and Business Development and Sales planning discussions.

82. Also in or about December, 2020, and on behalf of Edgy Bees, Mr. Crouse demanded that Mr. Hearn provide information and updates on his (Mr. Hearn's) accounts. Mr. Crouse was not in Mr. Hearn's chain of command, and Mr. Hearn did not report, directly or indirectly, to Mr. Crouse.

83. On December 11, 2020, Mr. Hearn and Mr. Crouse discussed issues about security Compliance, the status of Edgy Bees' security clearance, and concerns about the exchange of classified information to the company in Israel.

84. Also on December 11, Mr. Crouse sent Mr. Hearn a form verifying to an integration partner that Edgy Bees was not sending information to Israel, and that there were firewalls in place to prevent such from happening. Mr. Crouse asked Mr. Hearn to verify the information on the form.

85. Mr. Hearn told Mr. Crouse he refused to complete the form because he could not verify the information and suspected that firewalls had never been put in place. Upon information and belief, Mr. Hearn's refusal was relayed to Mr. Kaplan.

86. During most of his employment with Edgy Bees, Mr. Hearn was the only African American employee of the company. Edgy Bees previously had employed one other African American – Reuben Sowell – whose employment was terminated on November 18, 2019, shortly after Edgy Bees hired Mr. Hearn.

87. On January 7, 2021, Mr. Kaplan telephoned Mr. Hearn and terminated his employment with Edgy Bees. The termination enabled Edgy Bees and Mr. Kaplan to maximize profit and monetary advantage to their benefit and to Mr. Hearn's detriment.

88. When Mr. Hearn asked for the reason of termination, Mr. Kaplan did not answer and informed him that a termination letter would be forthcoming. Edgy Bees' proposed Severance Agreement lists no reason for Mr. Hearn's termination, nor was an alleged reason ever provided.

89. Under his Compensation Plan, Mr. Hearn was entitled to $960,000.00 in commissions based on the $12 million Air Force contract since that is 8% of $12 million. Edgy Bees only paid him $32,000 on September 15, 2020, $14,000 on December 31, 2020 and $24,800 on May 28, 2021, for a total of $70,800. Thus, $889,200.00 remains unpaid and due to Mr. Hearn. Upon receiving the first payment and learning that the amount was less

than his entitlement, Mr. Hearn stated via e-mail to Edgy Bees "I still disagree with the interpretation of the verbiage in the contract."

90. When Mr. Hearn continued to question his commission amount, Ms. Maman, and Edgy Bees official, told him that "It's up to Adam [Kaplan] to decide what he wants to give you."

91. Edgy Bees improperly deducted 56 hours of paid time off, totaling $4038.44, from Mr. Hearn's paycheck on or about December 31, 2020.

92. In addition to procuring and securing the STRATFi award, when he was terminated Mr. Hearn had numerous, multi-million dollar pending deals with the Philippines SOCOM, the Italian Ministry of Defense, the Greece Ministry of Defense, the Denmark Ministry of Defense and the UAE. Moreover, Mr. Hearn had meetings scheduled at the Greek Embassy Ministry of Defense and the Italian Embassy Ministry of Defense the following week.

93. Edgy Bees relied upon Mr. Hearn's professional relationships and reputation to secure these meetings. Upon information and belief, after his termination, these in-person meetings were canceled because no Edgy Bees personnel were authorized to attend.

94. Edgy Bees benefitted, and continues to benefit, from Mr. Hearn's out-of-the-box thinking. When Edgy Bees' product was not sufficiently developed to sell to the US government and only Research and Development contracts could be secured (but were no longer available), Mr. Hearn suggested to include another government agency for expansion into a completely separate product line. This allowed funding of a Research and Development effort to integrate the Edgy Bees technology into the U.S. Government Ariel Delivery platform (and potentially the international market as well). At that time,

Edgy Bees only had used its software for drones, but not for situational awareness in Precision Air Drop.

95. Research and Development funding for Precision Air Drop allowed a new product line, and greatly improved situational awareness of the warfighter in Precision Air Drop situations. Mr. Hearn secured an agreement that was expected to provide $250,000 in immediate proof of concept funding with a potential follow-on $2.5M contract for full development and integration into a Broad Agency Announcement contract, as well as further potential product sales into the Ariel Delivery market segment within defense industries. Mr. Hearn convinced the U.S. government to permit Edgy Bees to participate in a very costly test session in November 2020, at no cost to Edgy Bees, to determine validity of the theory. This test session led to the creation of a Cooperative Research and Development Agreement. Edgy Bees would not have secured such an agreement and opportunity without Mr. Hearn's efforts and his connections in the industry.

96. Edgy Bees received $9.5M in seed A round funding in February 2021, one month after Mr. Hearn was terminated. Upon information and belief, Edgy Bees had not secured any additional contracts or revenue at that time.

<u>**COUNT I**</u>
**(Breach of Contract)**
**Defendant Edgy Bees**

97. The factual allegations contained in this pleading are hereby incorporated by reference as if fully set forth herein.

98. There exists a contractual obligation owed by Edgy Bees to Mr. Hearn under which Edgy Bees is obligated, *inter alia*, to compensate Mr. Hearn.

99. Plaintiff performed all of his contractual obligations to Defendant and "earned" his commission.

100.    By failing to pay his commissions and wages and benefits, Edgy Bees materially breached its contract with Mr. Hearn.

101.    As a direct and proximate result of Edgy Bees' breach, Mr. Hearn has suffered substantial damages in an amount not less than $906,988.44, which will be proven at trial.

WHEREFORE, Plaintiff demands judgment in its favor and against Defendant Edgy Bees for damages not less than $906,988.44, the total amount to be proven at trial, plus pre- and post-judgment interest as permitted by law, costs, and such other and further relief as the Court deems just and proper.

## COUNT II
**(Breach of Implied Good Faith and Fair Dealing)**
**Defendant Edgy Bees**

101.    The factual allegations contained in this pleading are hereby incorporated by reference as if fully set forth herein.

102.    Plaintiff performed all of his contractual obligations owed to Defendant.

103. Implied in every contract in Maryland is a covenant of good faith and fair dealing.

104. Defendant was bound by the implied covenant of good faith and fair dealing in performing its contractual obligations owed to Plaintiff.

105. Defendant breached the implied covenant of good faith and fair dealing and frustrated Plaintiff's justified expectations.

106. By its acts and omissions as alleged herein, Defendant has frustrated Plaintiff's right to receive benefits due to him under their contract.

107. As a direct and proximate result of Edgy Bees' breach, Mr. Hearn has suffered substantial damages in an amount of not less than $906,988.44, which will be proven at trial.

108. Defendant's acts in breaching the implied covenant of good faith and fair dealing constitutes action taken in bad faith which was willful and malicious, thereby justifying an award of punitive damages.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant Edgy Bees for damages in an amount not less than $906,988.44, the total amount of which to be proven at trial, punitive damages in the amount of $500,000, plus pre- and post-judgment interest as permitted by law, costs, and such other and further relief as the Court deems just and proper.

## COUNT III
### (Quantum Meruit)
### Defendant Edgy Bees

109.     The factual allegations contained in this pleading are hereby incorporated by reference as if fully set forth herein.

110.     Valuable services were rendered to Edgy Bees by Mr. Hearn.

111.     The aforementioned services were accepted, used and enjoyed by Edgy Bees.

112.     As set forth above, the services were rendered under such circumstances that reasonably notified Edgy Bees that Mr. Hearn, in performing such services, expected to be paid.

113.     As a direct and proximate result of Edgy Bees' acts and omissions, Mr. Hearn has suffered substantial damages in an amount of not less than $906,988.44, which will be proven at trial.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant Edgy Bees for damages in an amount not less than $906,988.44, the total amount of which to be

proven at trial, plus pre- and post-judgment interest as permitted by law, costs, and such other

and further relief as the Court deems just and proper.

## COUNT IV
### (Unjust Enrichment)
### Defendant Edgy Bees

114.     The factual allegations contained in this pleading are hereby incorporated by

reference as if fully set forth herein.

115.     Mr. Hearn conferred a benefit upon Edgy Bees.

116.     Edgy Bees knew of and/or appreciated the benefit.

117.     Acceptance or retention by Edgy Bees of the benefits of Mr. Hearn's performance

makes it inequitable that it retain the benefit without payment of its value to Mr. Hearn.

118.     As a direct and proximate result of Edgy Bees' acts and omissions, Mr. Hearn has

suffered substantial damages in an amount of not less than $906,988.44, which will be

proven at trial.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant Edgy

Bees for damages in an amount not less than $906,988.44, the total amount of which to be

proven at trial, plus pre- and post-judgment interest as permitted by law, costs, and such other

and further relief as the Court deems just and proper.

## COUNT V
### (Violation of Maryland Wage Payment and Collection Law.
### *Annotated Code of Maryland*, **Labor & Employment Article, §3–501** *et seq.*)
### Defendant Edgy Bees and Kaplan

119.     The factual allegations contained in this pleading are hereby incorporated by

reference as if fully set forth herein.

120.     Edgy Bees violated Maryland Labor & Employment Article, §3-501, *et seq.* when

it failed to pay Mr. Hearn his earned "wages."

121.     As a result of Defendants' acts and omissions, Mr. Hearn has not been paid:

    a.   Payment on commissions for the STRATFi contract award, which was valued at $12 million, in the amount of $889,200.00;

    b.   $13,750.00 resulting from the 2020 wage deferral; and

    c.   56 hours of paid time off, totaling $4038.44, that was improperly eliminated on December 31, 2020.

120.     As a direct and proximate result of Defendants' acts and omissions, Mr. Hearn has suffered substantial damages in an amount of not less than $906,988.44, which will be proven at trial.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendants, jointly and severally, for damages in an amount not less than $906,988.44, the total amount of which to be proven at trial, plus pre- and post-judgment interest as permitted by law, three times (3x) outstanding wages, punitive damages in the amount of $500,000.00, reasonable attorney's fees, costs, and such other and further relief as the Court deems just and proper.

## <u>COUNT VI</u>
### (Violation of 42 U.S.C. §1981 - Discrimination)
### Defendant Edgy Bees and Kaplan

125.     The factual allegations contained in paragraphs 1-93 are hereby incorporated by reference as if fully set forth herein.

126.     By and through their conduct, Defendants did not afford Plaintiff equal rights under the law and violated 42 U.S.C. §1981 by discriminating against Plaintiff on the basis of his race and/or color.

127.     Plaintiff is African American.

128.     Defendants discriminated against Plaintiff when it terminated his employment on the basis of his protected group status.

129.     Defendant Kaplan intentionally engaged in acts and/or omissions in which he

authorized, directed or participated in a discriminatory act.

130.     There is no legitimate, non-discriminatory reason for Defendants' actions. Any

purported reason offered is pretextual to mask unlawful discrimination.

131.     As a direct and proximate result of Defendants' acts and omissions, Mr. Hearn

has suffered substantial damages in an amount of not less than $500,000.00, which will

be proven at trial.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendants, jointly and

severally, for damages in an amount not less than $500,000.00, the total amount of which to be

proven at trial, pre- and post-judgment interest as permitted by law, punitive damages in the

amount of $500,000.00, reasonable attorney's fees, costs, and such other and further relief as the

Court deems just and proper.

## <u>COUNT VII</u>
### (Violation of 42 U.S.C. §1981 - Retaliation)
### Defendant Edgy Bees and Kaplan

132.     The factual allegations contained in paragraphs 1-93 are hereby incorporated by

reference as if fully set forth herein.

133.     By and through his/its conduct, Defendants did not afford Plaintiff equal rights

under the law and violated 42 U.S.C. §1981 by retaliating against Plaintiff.

134.     Defendant Kaplan intentionally engaged in acts and/or omissions in which he

authorized, directed or participated in a retaliatory act.

135.     Plaintiff engaged in a protected activity.

136.     Defendants took a "materially" adverse action against Plaintiff.

137.     A causal connection existed between Plaintiff's activity and the adverse action

taken against him.

138.     Defendants retaliated against Plaintiff in the termination of his employment on the

basis of his protected group status.

139.     There is no legitimate, non-discriminatory reason for Defendants' actions. Any

purported reason offered is pretextual to mask unlawful discrimination.

140.     As a direct and proximate result of Defendants' acts and omissions, Mr. Hearn

has suffered substantial damages in an amount of not less than $500,00.00, which will be

proven at trial.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendants, jointly

and severally, for damages in an amount not less than $500,000.00, the total amount of which to

be proven at trial, pre- and post-judgment interest as permitted by law, punitive damages in the

amount of $500,000.00, reasonable attorney's fees, costs, and such other and further relief as the

Court deems just and proper.

**<u>COUNT VIII</u>**
**(Violation of Montgomery County Code §27-19)**
**Defendant Edgy Bees**

141.     The factual allegations contained in paragraphs 1-93 are hereby incorporated by

reference as if fully set forth herein.

142.     By and through its conduct, Defendant did not afford Plaintiff equal rights under

the law and violated Montgomery County Code §27-19 by discriminating against

Plaintiff on the basis of his race and/or color.

143.     Plaintiff is a member of a protected group.

144.     Defendant discriminated against Plaintiff in the termination of his employment on

the basis of his protected group status.

145.     There is no legitimate, non-discriminatory reason for Defendant's actions. Any

purported reason offered is pretextual to mask unlawful discrimination.

32

146.     As a direct and proximate result of Defendant's acts and omissions, Mr. Hearn

has suffered substantial damages in an amount of not less than $500,000.00, which will

be proven at trial.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant for

damages in an amount not less than $500,000.00, the total amount of which to be proven at trial,

pre- and post-judgment interest as permitted by law, punitive damages in the amount of

$500,000.00, reasonable attorney's fees, costs, and such other and further relief as the Court

deems just and proper.

## COUNT IX
### (Violation of False Claims Act – Retaliation)
### Defendant Edgy Bees

147.     The factual allegations contained in paragraphs 1-93 are hereby incorporated by

reference as if fully set forth herein.

148.     The False Claims Act protects employees, contractors, and agents who engage in

protected activity from retaliation in the form of their being "discharged, demoted,

suspended, threatened, harassed, or in any other manner discriminated against in the

terms and conditions of employment." 31 U.S.C. § 3730(h)(1).

149.     Mr. Hearn served as an employee of Edgy Bees, a federal contractor.

150.     Through Mr. Hearn's acts and disclosures, he engaged in protected activity when

he tried to prevent one or more violations of the False Claims Act by Edgy Bees.

151.     Mr. Hearn had an objectively reasonable belief that Edgy Bees was or soon would

be violating the False Claims Act. While making his disclosures about these violation, he

intended to stop one or more violations of the False Claims Act.

152.     As a result of his protected activity, Mr. Hearn was terminated from employment at Edgy Bees and not paid his commissions.

153.     As a result of Edgy Bees' acts and omissions, Mr. Hearn has suffered substantial damages in an amount of not less than $1,000,000.00, which will be proven at trial.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant Edgy Bees for damages in an amount not less than $1,000,000.00, the total amount of which to be proven at trial, double back pay (lost wages and benefits) with interest, plus pre- and post-judgment interest as permitted by law, emotional distress and other non-economic harm from the retaliation, reimbursement of reasonable attorney's fees, costs, and such other and further relief as the Court deems just and proper.

### *Jury Demand*

Plaintiff demands a trial by jury to the maximum extent permitted by law.

Respectfully Submitted,

/s/   *Richard R. Renner*

Richard R. Renner (Bar No. 29372)
Kalijarvi, Chuzi, Newman & Fitch P.C.
818 Connecticut Ave. N.W., Suite 1000
Washington, D.C. 20006
202.466.8696
FAX 877.527.0446
rrenner@kcnlaw.com
Attorney for Plaintiff