IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

VINCENT HEARN,                          :

                                        :

    v.                                  :   Civil Action No. DKC-21-2259

EDGY BEES INC., et al.                  :

                                        :

**MEMORANDUM OPINION**

Plaintiff Vincent Hearn brings this employment related civil action against Defendants Edgy Bees Inc. ("Edgy Bees") and its Chief Executive Officer, Adam Kaplan, for Breach of Contract (Count I, against Edgy Bees), Breach of Implied Covenant of Good Faith and Fair Dealing (Count II, against Edgy Bees), Quantum Meruit (Count III, against Edgy Bees), Unjust Enrichment (Count IV, against Edgy Bees), Violation of Maryland Wage Payment and Collection Law (Count V, against Edgy Bees and Mr. Kaplan), Discrimination in Violation of 42 U.S.C. § 1981 (Count VI, against Edgy Bees and Mr. Kaplan), Retaliation in Violation of 42 U.S.C. § 1981 (Count VII, against Edgy Bees and Mr. Kaplan), Violation of Montgomery County Code § 27-19 (Count VIII, against Edgy Bees), and Retaliation in Violation of the False Claims Act (Count IX, against Edgy Bees).  (ECF No. 36).  Presently pending and ready for resolution are (1) a partial motion to dismiss for failure to state a claim filed by Edgy Bees, (ECF No. 41), and (2) a motion

to dismiss for lack of personal jurisdiction or failure to serve process filed by Mr. Kaplan, (ECF No. 42).   No hearing is necessary.   Local Rule 105.6.   For the following reasons, Edgy Bees' motion to dismiss will be granted in part and denied in part, and Mr. Kaplan's motion to dismiss will be granted.

## I.    Background[1]

### A. Plaintiff's Employment Background

Plaintiff is a United States Air Force retiree who held a Top-Secret Sensitive Compartmented Information ("SCI") security clearance during his service in the military.  (ECF No. 36 ¶ 9). After retiring from the military, Plaintiff began a career in federal contracting.  (*Id.* ¶ 12).  He worked with a variety of companies in executive positions for at least eight years, gaining experience selling to the federal government and managing contracts governed by the Federal Acquisition Regulations ("FAR") and Defense Federal Acquisition Regulations ("DFAR").   (*Id.*). Beginning in 2014, Plaintiff worked for a federal contracting company for five years—first as its Contract Manager and then as its Director of Business Development and Foreign Military Sales Program.   During that time, he became certified in International

---

[1]   Unless stated otherwise, all facts are taken from Plaintiff's Amended Complaint or documents attached to and relied upon in the Amended Complaint and are accepted as true. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).

Traffic in Arms Regulations ("ITAR") and Export Administration Regulations ("EAR").  (*Id.* ¶ 13).  Both certifications required specialized training.  (*Id.* ¶ 14).  Edgy Bees' products are subject to EAR regulations.  (*Id.*).

**B. Plaintiff's Employment with Edgy Bees**

On September 25, 2019, Plaintiff applied for a position with Edgy Bees as its Business Development Director.  (*Id.* ¶ 15). Plaintiff, who resides in Arizona, was offered the position on October 27, 2019, and flew to Israel the next day to meet with additional personnel and begin employment.  (*Id.* ¶ 17).  His official hire date was November 1, 2019.  (*Id.*).  For the majority of his employment with Edgy Bees, Plaintiff was the only African-American employee.  (*Id.* ¶¶ 1, 86).

Edgy Bees is a Delaware corporation with its principal place of business in the United States in Gaithersburg, Maryland.  (*Id.* ¶¶ 3, 5).  It also has a principal place of business in Israel. (*Id.*).  Adam Kaplan was the Chief Executive Officer ("CEO") and owner of Edgy Bees, although he was not the sole owner or investor. (*Id.* ¶¶ 4, 69c).  He is a dual citizen of Israel and the United States.  (*Id.* ¶ 69c).

Plaintiff traveled to and worked in Maryland on November 11-13 and 25-26, 2019.  (*Id.* ¶ 30).[2]  In 2020, he traveled to and

---

[2]  There are errors in the paragraph numbering in the Amended Complaint, with two sets of paragraphs 28, 29, and 30.

worked in Maryland on January 1-3, 9-10, 20-23, and 28-31; February 25-26; and August 4-7.  (*Id.*).  Several of those trips to Maryland were for the purpose of attending meetings with Mr. Kaplan.  (*Id.* ¶ 28).  In March 2020, Edgy Bees and Mr. Kaplan grounded travel due to the Covid-19 pandemic.  (*Id.* ¶ 30).  For the remainder of Plaintiff's employment, he participated in teleconferences with other employees, including those in Maryland.  (*Id.* ¶ 31).

Also in March 2020, many employees were asked to defer their wages, including Plaintiff.  By July 2020, however, Plaintiff learned that while all other employees were again receiving their regular wages, he was the only employee whose wages had not been restored.  (*Id.* ¶ 51).

In June 2020, Mr. Kaplan directed that he and Plaintiff set up weekly 1-on-1 meetings.  (*Id.* ¶ 50).  However, Mr. Kaplan canceled a majority of these meetings, despite keeping his meetings with other employees.  Additionally, whenever Plaintiff tried to contact Mr. Kaplan, Mr. Kaplan would claim that he was traveling, despite being regularly available to other employees.  (*Id.*).

In July 2020, Mr. Kaplan denied Plaintiff permission to work remotely while on vacation, although a Caucasian employee was granted permission to do so during the same time period.  (*Id.* ¶ 55).  Plaintiff expressed his concerns about unequal treatment by Mr. Kaplan to the Edgy Bees Executive Director and Human Resources Director.  (*Id.* ¶¶ 56-57).

### C. **The STRATFi Contract**

One of the contracts on which Plaintiff worked was the AFWERX/US Air Force SBIR Phase II STRATFi ("STRATFi") contract. (*Id.* ¶¶ 20, 32). Plaintiff worked to prepare Edgy Bees' proposal for the project, and by the end of 2019 he had "prepared a timeline for visiting government customers to secure funding[] as well as set[ ]up milestones for the final proposal[,] which was due February 12, 2020." (*Id.* ¶ 33). After a series of additional efforts by Plaintiff, on March 10, 2020, Edgy Bees received a preliminary notification of award on the STRATFi contract. (*Id.* ¶ 38). From April 9 to July 1, 2020, Plaintiff engaged in almost daily efforts to revise the proposal for final submission, which was ultimately accepted on July 1, 2020. (*Id.* ¶¶ 41, 42).

Within the proposal and award, "Edgy Bees listed a number of milestones that had to be achieved to invoice the US Government for payment." (*Id.* ¶ 45). The United States Air Force certified each milestone as it was completed, "and by invoicing the government, Edgy Bees certified that it incurred the costs [it] claimed were associated with that milestone[] and that [it] did so while complying with ITAR and EAR regulations." (*Id.*). The contract also required that Edgy Bees obtain a United States Secret Facility clearance and hire employees who were United States citizens with Secret clearances. (*Id.* ¶ 58). This was necessary

because the work was "performed on classified systems within the US Air Force." (*Id.* ¶ 59).

According to Plaintiff,

> [e]ach time Edgy Bees certified completion of a milestone, invoiced the US government and was paid, it was doing so knowing that it was not in compliance with the FAR and DFAR regulations of the contract. In addition, Defendants were also knowingly not using the funds that [the] government awarded to them for related milestones. Edgy Bees was thereby defrauding the U.S. government by claiming compliance and violating the False Claims Act (FCA), 31 U.S.C. § 3729, and sequence.

(*Id.* ¶ 58). Plaintiff "disclosed and cautioned Edgy Bees management . . . that Edgy Bees was violating the FARs, DFARs, and the STRATFi contract itself regarding its handling of US Air Force sensitive information"—specifically, information designated as "NOFORN," meaning "foreign eyes" could not view it. (*Id.* ¶ 60).

Plaintiff asserts that although much of the engineering work on the STRATFi contract was being performed in Israel, Edgy Bees assured the program managers, in Plaintiff's presence, that it hired United States engineers and planned to hire more engineers for the contract. (*Id.* ¶ 63). He also alleges that in the private funding cost plan approved by the Air Force, Edgy Bees represented that it would be hiring engineers, managers, research and development leads, and software developers with security clearances, all to be employed within the United States, which was false. (*Id.* ¶¶ 64-65). Plaintiff disclosed to management that

6

the contract requirements were not being met and that "Edgy Bees needed to hire a [United States] engineering team to work on the sensitive unclassified parts of the contract." (*Id.* ¶ 65). Furthermore, "in violation of the contract and FAR requirements, Edgy Bees never disclosed to the [United States] government that information would be transferred back and forth to Israel." (*Id.* ¶ 66).

Finally, for Edgy Bees to obtain security clearances for its personnel, it needed to secure a facility security clearance at the same level. This posed a challenge because Edgy Bees was owned by a foreign parent company, which could not have access to classified information. (*Id.* ¶ 69). Thus, Edgy Bees was required to implement procedures and safeguards to prevent its parent company from accessing classified or sensitive unclassified information, including a Technology Control Plan ("TCP"). (*Id.* ¶¶ 69a, 69b). Plaintiff saw that the TCP, which contained information provided by Mr. Kaplan, omitted that the owners and investors of Edgy Bees were citizens of Israel. (*Id.* ¶ 69c). Plaintiff's training led him to believe that information regarding the citizenship of the owners is important to the "Defense Department because of its national security interest in preventing the unauthorized flow of defense technologies to other countries." (*Id.* ¶ 69d). He also knew from his ITAR and EAR training that it was of vital national interest that work performed in defense

7

technology be done in the United States in Sensitive Compartmented Information Facilities ("SCIFs").  (*Id.*).  Plaintiff observed that Edgy Bees and Mr. Kaplan were laying off engineers in the United States and transferring work to engineers in Israel, which was inconsistent with the United States regulations, government interests, and language in the contract award stating that it required United States engineers.  (*Id.* ¶ 69e).

Plaintiff also told Edgy Bees that it was required to hire a Facility Security Officer ("FSO") consulting company to assist in securing a facility clearance and employee Secret clearances for the United States team and to appoint an internal FSO to facilitate information exchange.  (*Id.* ¶ 69).  The FSO, Assistant FSO, and Insider Threat Program Security Officer were internal positions that Edgy Bees was required to establish, and they were all required to be non-dual United States citizens.  (*Id.* ¶ 71). Plaintiff was the only employee qualified to hold these positions. (*Id.*).  On July 7 and 8, 2020, Plaintiff was notified that two other individuals were taking over his duties as Facility Security Officer ("FSO"), but these duties could not be performed by foreign citizens, and no other individual in Edgy Bees had the required experience and security clearance.  (*Id.* ¶ 67).

In September 2020, Plaintiff emailed management identifying his concerns about information the FSO consulting company was requesting.  (*Id.* ¶ 73).  Suspecting that information in the

documents that would be provided to the FSO consulting company
would be incorrect or incomplete, Plaintiff disclosed to Edgy Bees
officials that "providing false information was not acceptable and
would place Edgy Bees in breach of its government contract." (*Id.*
¶ 75). Despite this, Mr. Kaplan directed that information provided
to the FSO would not include information about the owners, board
members, or investors and that Plaintiff would be excluded from
executive meetings and the documentation process. (*Id.* ¶ 76). In
its registration with the US government as a federal contractor in
the System for Award Management ("SAM"), Edgy Bees stated that "it
did not have an immediate owner and was owned by a foreign entity."
(*Id.* ¶ 77). According to Plaintiff, this information is material
because it assists in assuring that military technology is not
transferred without authorization to foreign countries. (*Id.*).
Edgy Bees did not register its foreign parent company with SAM,
and Mr. Kaplan was identified as the sole owner. (*Id.* ¶ 78). Edgy
Bees also falsely certified to the federal government that it did
not intend to do any work on any government contract in a place
other than the address listed on its SAM registration, which was
in violation of FAR Clause 52.215.6 Place of Performance. (*Id.* ¶
79).

On December 11, 2020, Plaintiff discussed issues about
security compliance, the status of Edgy Bees' security clearance,
and concerns about the exchange of classified information to the

9

company in Israel with a new hire, Mr. Crouse, a Caucasian employee
who was hired to replace Plaintiff. (*Id.* ¶¶ 81-83). On the same
day, Plaintiff refused to complete a form to be submitted to an
integration partner stating that Edgy Bees was not sending
information to Israel and that there were firewalls in place to
prevent that from happening because Plaintiff "could not verify
the information and suspected that firewalls had never been put in
place." (*Id.* ¶¶ 84-85).

On January 7, 2021, Mr. Kaplan terminated Plaintiff's
employment via phone call. (*Id.* ¶ 87). Mr. Kaplan did not provide
Plaintiff with a reason for his termination. (*Id.* ¶ 88).

Plaintiff filed his Complaint in this matter on September 2,
2021. (ECF No. 1). On May 26, 2022, Judge George Jerrod Hazel[3]
granted Defendants' motions to dismiss and permitted Plaintiff
twenty-one days to file an amended complaint. (ECF Nos. 27, 28).
On July 18, 2022, Plaintiff filed an Amended Complaint, and on
August 31, 2022, Defendants filed their respective motions to
dismiss.

## II. Edgy Bees' Partial Motion to Dismiss

Defendant Edgy Bees moves to dismiss for failure to state a
claim under Federal Rule of Civil Procedure 12(b)(6). The purpose
of a motion to dismiss under Rule 12(b)(6) is to test the

---

[3] This case was transferred to the undersigned upon the
resignation of Judge Hazel.

sufficiency of the complaint.  *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).  A plaintiff's complaint need only satisfy the standard of Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2). "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007).  That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration in original) (internal quotation marks omitted).

At this stage, all well-pleaded allegations in the complaint must be considered as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and all factual allegations must be construed in the light most favorable to the plaintiff, *see Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999).  In evaluating the complaint, unsupported legal allegations need not be accepted.  *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989).  Legal conclusions couched as factual allegations are also insufficient, *Iqbal*, 556 U.S. at 678, as are conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir.

11

2009).  Ultimately, the complaint must "'permit[] the court to infer more than the mere possibility of misconduct' based upon 'its judicial experience and common sense.'"  *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679).

Defendant Edgy Bees moves to dismiss Count VIII, violation of Montgomery County Code § 27-19, and Count IX, retaliation in violation of the FCA.  (ECF No. 41).  Edgy Bees first argues that Plaintiff has failed to state a claim under the Montgomery County Code because he fails to allege that any discriminatory decisions against him occurred in Montgomery County.  (ECF No. 41-1, at 6). Edgy Bees next argues that Plaintiff has failed to allege that he engaged in protected activity and has failed to allege employer knowledge or causation under the FCA.  (*Id.*)

**A.  Montgomery County Code § 27-19 (Count VIII)**

Plaintiff states that during most of his employment with Edgy Bees he was the only African American employee and was treated adversely as compared to Edgy Bees' Caucasian employees.  (ECF No. 36 ¶¶ 1, 86).  Plaintiff brings this claim of discrimination under Montgomery County Code ("MCC") § 27-19 for discrimination on the basis of his race and/or color.  Section 27-19 of the MCC "prohibits employers from 'discriminat[ing] against any individual with respect to compensation, terms, conditions, or privileges of employment' because of the individual's race."  *Belfiore v. Merch.*

12

*Link, LLC*, 236 Md.App. 32, 44-45 (2018).  "Maryland state court cases have clarified that the MCC provides relief for residents of Montgomery County for employment discrimination occurring within the county."[4] *Tinoco v. Thesis Painting, Inc.*, No. 16-cv-752-GJH, 2017 WL 52554, at *5 (D.Md. Jan. 3, 2017); *see also Edwards Sys. Tech. v. Corbin*, 379 Md. 278, 294 (2004) (construing the analogous Prince George's County Code section as "covering only discrimination occurring in Prince George's County by an employer with a significant presence in Prince George's County").

This claim was previously dismissed because Plaintiff failed to allege sufficiently in his original Complaint that any purported discrimination occurred within Montgomery County.  Plaintiff contends that the Amended Complaint added "allegations of Mr. Hearn's work at the Edgy Bees headquarters in Gaithersburg." (ECF No. 43, at 16).  The Amended Complaint does contain additional details about the dates during which Plaintiff traveled to and worked in the state of Maryland, and some of which included

---

[4] Section 20-1202 of the Maryland State Government Code provides that "(a)[t]his section applies only in Howard County, Montgomery County, and Prince George's County" and "(b) . . . a person that is subjected to a discriminatory act prohibited by the county code may bring and maintain a civil action against the person that committed the alleged discriminatory act for damages, injunctive relief, or other civil relief."  Subsection (c) requires that an action under subsection (b) "be commenced in the circuit court for the county in which the alleged discriminatory act occurred."  Md. Code Ann., State Gov't § 20-1202(a)-(c).

meetings with Mr. Kaplan in the Gaithersburg office in Montgomery County.

These dates do not, however, include the dates upon which the alleged discrimination occurred.  Plaintiff's discrimination claim is premised primarily on his termination, which occurred when Mr. Kaplan called Plaintiff.  Mr. Kaplan resided in Israel, and Plaintiff resided in Arizona.  The Amended Complaint does not allege that either party was in Montgomery County at the time this occurred, nor does it contain any allegations about any other individuals involved in the firing that were located in Montgomery County.  The same is true for the allegations that Mr. Kaplan denied Plaintiff's request to work remotely while on vacation and that Plaintiff's pay was withheld longer than that of his co-workers.  Because the Amended Complaint does not allege sufficiently that any discriminatory conduct occurred in Montgomery County, Plaintiff cannot maintain his claim under the MCC.  Accordingly, the court will grant Edgy Bees' motion to dismiss Count VIII.

### B.  False Claims Act (Count IX)

Plaintiff brings a retaliation claim under the FCA alleging that he was terminated from his employment because of his protected activities.  (ECF No. 36, at 33).  The FCA creates liability for anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval [to the government or]

14

knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A) & (B). The FCA also protects any "employee, contractor, or agent" from discharge, demotion, or other manner of discrimination in the conditions of employment "because of lawful acts done by the employee, contractor, agent[,] or associated others in furtherance of an action under [the FCA] or other efforts to stop 1 or more violations of [the FCA]." 31 U.S.C. § 3730(h)(1).

To plead a § 3730(h) retaliation claim, "a plaintiff must allege facts sufficient to support a 'reasonable inference' of three elements: (1) he engaged in protected activity; (2) his employer knew about the protected activity; and (3) his employer took adverse action against him as a result." *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 200 (4th Cir. 2018).

### 1. Protected Activity

In illustrating the history of § 3730(h), the court in *Grant* confirmed that there are two categories of protected activities contemplated by the amendment to the statute:

> Prior to 2009, Section 3730(h) originally defined protected activity as measures taken "in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section." *See* False Claims Amendments Act of 1986, Pub. L. 99-562, § 4, 100 Stat. 3153, 3157-78 (1986). In interpreting this

15

provision, we applied the "distinct possibility" standard: employees engaged in protected activity when "litigation is a distinct possibility, when the conduct reasonably could lead to a viable FCA action, or when . . . litigation is a reasonable possibility." *Mann v. Heckler & Koch Def., Inc.*, 630 F.3d 338, 344 (4th Cir. 2010) (quoting *Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 869 (4th Cir. 1999)). Whether the distinct possibility standard is met is determined from the "perspective of the facts known by the employee at the time of the protected conduct." *Id.* at 345.

In 2010, Congress amended § 3730(h) to include a second category of protected activity: that which constitutes "other efforts to stop 1 or more violations of [the FCA]." 31 U.S.C. § 3730(h)[.] . . . Indeed, we and other circuits have recognized that the amended language broadens the scope of protected activity.

*Grant*, 912 F.3d at 200-01 (footnote omitted). The "other efforts to stop 1 or more violations of [the FCA]" is subjected to an objective reasonableness standard for protected activity. *Id.* at 201. The court in *Grant* further defined what it means for an act to be a "protected activity":

[A]n act constitutes protected activity where it is motivated by an objectively reasonable belief that the employer is violating, or soon will violate, the FCA. A belief is objectively reasonable when the plaintiff alleges facts sufficient to show that he believed his employer was violating the FCA, that this belief was reasonable, that he took action based on that belief, and that his actions were designed to stop one or more violations of the FCA. However, while the plaintiff's actions need not "lead to a viable

16

> FCA action" as required under the distinct
> possibility standard, they must still have a
> nexus to an FCA violation.

*Grant*, 912 F.3d at 201-02. An FCA violation is "(1) . . . a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter [knowledge]; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a 'claim')." *United States ex rel. Rostholder v. Omnicare, Inc.*, 745 F.3d 694, 700 (4th Cir. 2014) (alteration in original).

Plaintiff alleges that he engaged in a protected activity when he: (1) cautioned Edgy Bees management that it was violating the FARs, DFARs, and the STRATFi contract by permitting foreign eyes on sensitive information (ECF No. 36 ¶ 60); (2) disclosed to management that, pursuant to FAR 252.204-7012 and the contract requirements, Edgy Bees needed to hire a United States engineering team to work on the sensitive parts of the contract, (*id.* ¶ 65); (3) told Edgy Bees that it was required to hire an FSO to assist in securing facility clearance and Secret clearances for the United States team, (*id.* ¶ 69); (4) disclosed to Edgy Bees that providing false information to the FSO consulting company was not acceptable and would place Edgy Bees in breach of its government contract, (*id.* ¶ 75), and (5) refused to sign a form certifying compliance with security protocols to an integration partner, (*id.* ¶¶ 84-85). Plaintiff argues that he has sufficiently pleaded an FCA

retaliation claim because his actions were taken in an effort to stop one or more violations of the FCA and were objectively reasonable. (ECF No. 43, at 8-9). The court agrees.

An "employee's investigation must concern false or fraudulent claims [to be] protected activity under the FCA." *Skibo ex rel. United States v. Greer Lab'ys, Inc.* 841 F.App'x 527, 534 (4th Cir. 2021) (internal quotation marks omitted). Plaintiff has alleged that the STRATFi contract required engineers to be United States citizens with Secret clearances and listed milestones that had to be achieved to invoice the federal government for payment. Each time a milestone was completed and Edgy Bees invoiced the government, it certified that it incurred the costs in compliance with ITAR and EAR regulations. Plaintiff has alleged that Edgy Bees was invoicing the government and requesting payment knowing that it was not in compliance with ITAR or EAR regulations and were thus knowingly defrauding the government by providing false claims. (ECF No. 36 ¶¶ 44-45, 58-59). Plaintiff has therefore pleaded that he believed Edgy Bees was violating the FCA.

Plaintiff has pleaded facts that support a finding that his belief that fraudulent claims were being made was objectively reasonable, based on his familiarity with government contracts and his work on securing this particular contract. Plaintiff has alleged that he had a background in government contracting, including experience working with the regulations that applied to

18

the STRATFi contract.  He has alleged that he was the one who wrote
most of the proposals and did most of the work to secure the
STRATFi contract.  He has also alleged that he continued to work
on the project once the contract was secured and communicated with
the government on behalf of Edgy Bees regarding the contract.  It
is therefore a reasonable inference that Plaintiff would be
familiar with the requirements of the contract and would be able
to recognize potential violations and false submissions for
payment to the government under the contract.  *Compare id.*
(determining that the plaintiff's beliefs were objectively
reasonable where he knew an inspector was asked to make a
problematic engine disappear), *with Carlson v. DynCorp Int'l LLC,*
657 F.App'x 168, 174 (4th Cir. 2016) (determining that the
plaintiff's complaints that DynCorp failed to charge overhead
expenses articulated no mechanism by which the government could
later be fraudulently overbilled or that a false claim was being
made to the government and thus was not objectively reasonable
under the FCA).

Finally, Plaintiff has alleged that he took actions to stop
those violations by informing Edgy Bees management, including Mr.
Kaplan, on multiple occasions that it was violating the regulations
and STRATFi contract.  *See Grant*, 912 F.3d at 202 (finding that
the plaintiff's raising suspected concerns to management was
sufficient to permit a trier of fact to find that he engaged in

19

efforts to stop a potential FCA violation).  Thus, Plaintiff has alleged facts sufficient to state the first element of an FCA retaliation claim.

### 2. Employer Knowledge

To plead an FCA retaliation claim, a plaintiff must also state facts sufficient to show a reasonable inference of employer knowledge.  *Grant*, 912 F.3d at 200.  In multiple instances throughout his Amended Complaint, Plaintiff alleges that he alerted Edgy Bees management about its failure to comply with contract requirements and the submission of false claims to the government.  (ECF No. 36 ¶ 60 ("Mr. Hearn disclosed and cautioned Edgy Bees management, including Mr. Glassberg, Ms. Taichler, and Mr. Kaplan, that Edgy Bees was violating the FARs, DFARs[,] and the STRATFi contract itself regarding its handling US Air Force sensitive information"));  (*Id.* ¶¶ 62, 65, 73, 75).  This is sufficient to allege that Edgy Bees had knowledge of Plaintiff's protected activities.  *See id.* at 203 (finding employer knowledge where the plaintiff complained to management on numerous occasions).

### 3. Causation

The final element of pleading an FCA retaliation claim requires a plaintiff to allege facts sufficient to show a reasonable inference of causation—that his employer took an adverse action against him as a result of his protected activity.

20

*Id.* at 200.   "An employer undertakes a materially adverse action opening it to retaliation liability if it does something that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."   *See id.* at 203 (internal quotation marks omitted).   "In the absence of direct evidence of causation, close temporal proximity between protected activity (or an employer's knowledge of protected activity) and an adverse employment action may give rise to an inference of causation." *United States ex rel. Complin v. N.C. Baptist Hosp.*, 818 F.App'x 179, 185 (4th Cir. 2020).

Plaintiff's protected activities took place from approximately July 2020 to at least September 2020, when Plaintiff notified Edgy Bees management of his concern that it was not complying with FSO security requirements.   (ECF No. 36 ¶¶ 71-73). Plaintiff was terminated in January 2021, and Mr. Kaplan did not give Plaintiff a reason for his termination.   (*Id.* ¶¶ 87-88).   The sequence of facts alleged permit a reasonable inference that Plaintiff was terminated because of his protected activities and reports to management.   Shortly after Plaintiff's September 2020 report, in October 2020, Mr. Kaplan and Edgy Bees posted a job listing for a position that was "virtually identical" to the position held Plaintiff.   After a Caucasian male was hired for the position in December 2020, Plaintiff was excluded from executive meetings and discussions and told to provide the new hire updates

21

on his accounts.  Plaintiff was then fired in January 2021.  (ECF No. 36 ¶¶ 80-87).  The reasonable inference is that after a series of complaints, and just one month after Plaintiff notified management that it was not complying with security requirements, Edgy Bees intended to and ultimately did replace and fire Plaintiff.  This is sufficient to allege causation.  *See Grant*, 912 F.3d at 194-95 (finding reasonable inference of causation where plaintiff alerted management about violations on multiple occasions between 2008 and 2014, with the latest alert being in March 2014, and notified him in April 2014 that he would be terminated in May 2014).  Accordingly, Plaintiff has sufficiently pleaded a claim for FCA retaliation where there is a reasonable inference of causation.  Edgy Bees' motion to dismiss this count will be denied.

## III. Mr. Kaplan's Motion to Dismiss

Defendant Kaplan moves to dismiss the claims against him for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) and for insufficient service of process under Federal Rule of Civil Procedure 12(b)(5).

When a court's power to exercise personal jurisdiction over a nonresident defendant is challenged by a motion under Rule 12(b)(2), "the jurisdictional question is to be resolved by the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence."  *Carefirst*

*of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.,* 334 F.3d 390, 396 (4th Cir. 2003).  If the existence of jurisdiction turns on disputed facts, "the court may resolve the challenge on the basis of a separate evidentiary hearing[] or may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question. *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989).  If the court chooses to rule without conducting an evidentiary hearing, relying solely on the basis of the complaint, affidavits and discovery materials, "the plaintiff need only make a prima facie showing of personal jurisdiction." *Carefirst of Md., Inc.*, 334 F.3d at 396. In determining whether the plaintiff has proven a prima facie case of personal jurisdiction, "the court must take all disputed facts and reasonable inferences in favor of the plaintiff." *Id.*

A district court has personal jurisdiction over a nonresident defendant when two conditions are satisfied: (1) the exercise of jurisdiction is authorized under the state's long-arm statute; and (2) the exercise of jurisdiction comports with the due process requirements of the Fourteenth Amendment. *Id.*

While the Maryland long-arm statute authorizes the exercise of personal jurisdiction to the limits permitted by the Due Process Clause of the Fourteenth Amendment, *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 188 (4th Cir. 2016) (citing *Beyond Sys., Inc. v. Realtime Gaming Holding Co., LLC*, 388 Md. 1, 22 (2005)), both the Supreme Court of Maryland and the United States Court of Appeals

23

for the Fourth Circuit have held that it is not "permissible to simply dispense with analysis under the long-arm statute," *Pandit v. Pandit*, 808 F.App'x 179, 185 (4th Cir. 2020) (quoting *Mackey v. Compass Mktg., Inc.*, 391 Md. 117, 141 n.6 (2006)). Instead, the "plaintiff must specifically identify a statutory provision that authorizes jurisdiction, either in his complaint or in his opposition to a Fed. R. Civ. P. 12(b)(2) motion." *Orbita Telecom SAC v. Juvare LLC*, 606 F.Supp.3d 240, 247 (D.Md. 2022).

Plaintiff identifies sections 6-103(b)(1) and (4) of the Maryland Courts and Judicial Proceedings Code as the relevant long-arm statute provisions that confer jurisdiction over Mr. Kaplan. Those provisions state:

> (b) A court may exercise personal jurisdiction over a person, who directly or by an agent: (1) Transacts any business or performs any character of work or service in the State; . . . [or] (4) [c]auses tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State[.]

Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(1), (4). The statute contains a caveat: "If jurisdiction over a person is based solely upon [§ 6-103], he may be sued only on a cause of action *arising from* any act enumerated in [that] section." § 6-103(a) (emphasis added).

Plaintiff's claims against Mr. Kaplan are for violation of the Maryland Wage Payment and Collection Law (Count V), discrimination in violation of 42 U.S.C. § 1981 (Count VI), and retaliation in violation of 42 U.S.C. § 1981 (Count VII). Plaintiff contends that his claims against Mr. Kaplan arise from the business Mr. Kaplan conducts in Maryland because Mr. Kaplan used the Edgy Bees headquarters in Gaithersburg "to pay, withhold pay from, and fire" Plaintiff. (ECF No. 43, at 18).

Actions Mr. Kaplan took in his role as CEO of Edgy Bees are insufficient to establish personal jurisdiction, as the court looks to Mr. Kaplan's contacts with Maryland in his individual capacity, not his corporate capacity. *See Mates v. N. Am. Vaccine, Inc.*, 53 F.Supp.2d 814, 821 (D.Md. 1999) (citing *Calder v. Jones*, 465 U.S. 783, 790 (1984)); *see also Tang v. Altimmune, Inc.*, No. 21-cv-3283-DLB, 2023 WL 2648795, at *7 (D.Md. Mar. 24, 2023) ("[The defendant's] role as an officer of a company whose headquarters is in Maryland is insufficient to establish personal jurisdiction; the Court must look to his contacts with Maryland 'in his individual capacity.'"). Plaintiff has not identified any actions Mr. Kaplan personally took in Maryland that form the basis for the claims against him. Specifically, Plaintiff has not alleged that Mr. Kaplan failed to pay him wages due while in Maryland, or that any discrimination or retaliation happened in Maryland. Therefore, Plaintiff has failed to make a prima facie showing that

the Maryland long-arm statute authorizes the court to exercise personal jurisdiction over Mr. Kaplan.

Even if the requirements of the long-arm statute were satisfied here, an exercise of jurisdiction would not comport with due process. For a court to exercise jurisdiction over a nonresident defendant, the Due Process Clause requires that "the defendant has 'minimum contacts' with the forum, such that to require the defendant to defend its interests in that state 'does not offend traditional notions of fair play and substantial justice.'" *Carefirst of Md., Inc.*, 334 F.3d at 397 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

The standard for determining whether a court may exercise personal jurisdiction over a nonresident defendant "varies, depending on whether the defendant's contacts with the forum state also provide the basis for the suit"—that is, whether the plaintiff seeks to establish "general" or "specific" personal jurisdiction. *Id.* A plaintiff may establish general personal jurisdiction when a defendant has "activities in the state [that are] 'continuous and systematic'" and unrelated to "the defendant's contacts with the state [that] are . . . the basis for the suit." *Id.* (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002)). If a court has general personal jurisdiction over a defendant, it "may hear *any* claim against that defendant, even if all the incidents underlying the claim occurred in a

different State." *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255, 262 (2017) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

When the defendant is an individual, courts look to the individual's domicile to determine whether it has general personal jurisdiction over him. *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014); *Bristol-Myers*, 582 U.S. at 262. Here, the complaint alleges that Mr. Kaplan is a dual United States and Israeli citizen and a resident of Israel. (ECF No. 36 ¶¶ 4, 7, 69.d). A natural person may have multiple residences but has only one domicile. *C.I.R. v. Swent*, 155 F.2d 513, 515 (4th Cir. 1946). "To establish a domicile in a State, it must be shown that the individual has a physical presence in that State with an intent to make [that] State a home." *Reddy v. Buttar*, 38 F.4th 393, 400 (4th Cir. 2022) (alteration in original) (internal quotation marks omitted). Plaintiff has not shown that Mr. Kaplan has a physical presence in Maryland with an intent to make it his home—only that he has visited Maryland on a small number of days in 2019 and 2020. There is thus no general personal jurisdiction over Mr. Kaplan in Maryland.

Specific jurisdiction, on the other hand, exists when "[t]he contacts related to the cause of action . . . create a 'substantial connection' with the forum state." *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 625 (4th Cir. 1997) (quoting *McGee v. Int'l*

27

*Life Ins. Co.*, 355 U.S. 220, 223 (1957)).  Indeed, there must be "an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State." *Goodyear*, 564 U.S. at 919 (internal quotation marks omitted).  Here, as previously discussed, Plaintiff has not shown that his wage, discrimination, and retaliation claims arise out of Mr. Kaplan's activities in Maryland.  Therefore, there is also no specific personal jurisdiction over Mr. Kaplan in Maryland. Thus, asserting personal jurisdiction over Mr. Kaplan would not comport with due process.  Accordingly, the claims against Mr. Kaplan must be dismissed for lack of personal jurisdiction.[5]

## IV. Conclusion

For the foregoing reasons, Edgy Bees' motion to dismiss will be granted in part, and denied in part, and Mr. Kaplan's motion to dismiss will be granted.  A separate Order follows.

/s/
_____
DEBORAH K. CHASANOW
United States District Judge

---

[5] Because the court has determined that it does not have jurisdiction over Mr. Kaplan, it need not determine whether the claims against Mr. Kaplan should be dismissed under Federal Rule of Civil Procedure 12(b)(5) for insufficient service of process.